Katharine KENNEDY, Daniel
Waggoner, and Anne
Keating Plaintiffs,

v.

AVONDALE ESTATES, GEORGIA, a Municipal Corporation, John Parker, in his official capacity as City Manager and Police Chief of Avondale Estates, Lyda Steadman, in her official capacity as City Clerk–Treasurer of Avondale Estates, and Craig A. Mims, in his official capacity as Code Enforcement Officer of Avondale Estates · Defendants.

No. CIV.A. 1:00–CV–1847.

United States District Court,
N.D. Georgia,
Atlanta Division.

March 31, 2005.

Cristina Correia, Cristina Correia, L.L.C., Avondale Estates, GA, Marcia Weil Borowski, Thompson Rollins Schwartz & Borowski, Decatur, GA, Moffatt Laughlin McDonald, Neil T. Bradley, Elizabeth Lynn Littrell, Gerald R. Weber, American Civil Liberties Union Foundation of Georgia, Inc., Atlanta, GA, for Plaintiffs.

Ernest Ronald Bennett, Jr., Richard A. Carothers, William McLane Coolidge, III, Carothers & Mitchell, LLC, Buford, GA, for Defendants.

## ORDER

CARNES, District Judge.

**TABLE OF CONTENTS**

BACKGROUND ................................................1188

 I. Factual Background .................................................1188
 A. A History of Amendments .......................................1188
 B. Key Provisions of the Current Ordinance .........................1190
 C. The Parties ..................................................1195

 II. Procedural History ...............................................1195
DISCUSSION ................................................1196

 I. Individuals Sued in their Official Capacity ...........................1196

 II. Federal Constitutional Standards for Regulating Speech ...............1196
 A. Content–Based vs. Content–Neutral ..............................1196
 B. Are All Sign Regulations Necessarily Content–Based? .............1198
 C. Commercial Speech ...........................................1198

 III. Standing .......................................................1199

 IV. Challenged Provisions of the Avondale Estate's Ordinance .............1200
 A. Provisions of the Ordinance Directed at Commercial Speech .......1200
 1. Real Estate Signs .........................................1200
 2. Yard Sale Signs ..........................................1202
 B. Provisions of the Ordinance Directed at Noncommercial Speech....1204
 1. General Size, Height, Number, and Setback Restrictions
 Are Content–Neutral .....................................1204
 a. Height, Size, and Number Restrictions ..................1205
 b. Setback Provision ......................................1208
 2. Exemption of Seasonal Displays and Decorations..............1209
 a. Seasonal Display Exemption .............................1209
 3. Flags ....................................................1211
 4. Grandfathering Provision ..................................1213

 V. Analysis Under the Georgia Constitution ...........................1216

 VI. Voting Rights Act ...............................................1216

 VII. Equal Protection Claims .........................................1218

 VIII. Severability of Unconstitutional Provisions .........................1219
CONCLUSION ................................................1220

Established as a planned community in the 1920's[1] and placed on the National Register of Historic Places in 1986, Avondale Estates is a small municipality just outside the City of Atlanta. For decades, Avondale Estates [hereinafter "Avondale"] has been known for its well-tended lawns, its Tudor-style buildings, its lake, and its lasting charm as a village-type community surrounded by a large bustling metropolis. Avondale is also known for its rules and regulations. The City Fathers apparently believe that it is no accident that Avondale has maintained its aesthetic appeal at a time when many other older middle-class neighborhoods have not; instead, they con-

---

**1.** According to Terry Martin–Hart, "Founded in 1924 … Avondale Estates is a unique planned community—the only one of its kind in Georgia and the Southeast in the early twentieth century." TERRY MARTIN-HART, IMAGES OF AMERICA: AVONDALE ESTATES (Arcadia Publishing 2000).

tend that it is their hands-on monitoring of the neighborhood that has helped insure its preservation. The plaintiffs, who are residents of Avondale, however, chafe under these rules and what they perceive as Avondale's badge-heavy enforcement. Represented by the ACLU in this litigation, the plaintiffs specifically challenge Avondale's Sign Ordinance as being in violation of the First Amendment and Equal Protection Clause of the United States Constitution. The case is now before this Court on both parties' motions for summary judgment, each of which the Court concludes should be **GRANTED** in part and **DENIED** in part.

### BACKGROUND

Plaintiff and defendant have filed cross-motions for summary judgment. Unless otherwise indicated, the Court draws the facts of this case from Plaintiffs' Statement of Material Facts Not in Dispute [71] ("PSMF"), Defendants' Response to Plaintiffs' "Fourth" Motion for Summary Judgment and Brief in Support of Defendants' Cross–Motion for Summary Judgment [73] ("Defs.' Resp."), Defendants' Statement of Undisputed Facts [74] ("DSUF"), and Plaintiffs' Response to Defendants' Statement of Undisputed Facts [76] ("Pls.' Resp.").

### I. Factual Background

#### A. A History of Amendments

As noted, the City of Avondale Estates, is a small municipality located approximately ten miles from downtown Atlanta. At least one square mile of the city's one and a quarter square miles consists of residential structures, most of which are single family homes. There are approximately 1,200 single family homes in the City. (Defs.' Resp. at 2.) On September 11, 1967, defendant adopted an ordinance prohibiting all signs except "street number and/or resident's name" in "any area of the

city zoned for residential use." (PSMF at ¶ 1.) At the time this action was filed in July of 2000, defendant had continued to ban all signs in residential areas except house numbers, historic markers, original house designations, and street identification numbers. (PSMF at ¶ 2.) Since the start of this litigation, and likely in response to it, defendant has amended its sign ordinance five times. These amendments were adopted on November 8, 2000, November 26, 2001, November 25, 2002, September 22, 2003, and March 23, 2004.

On November 8, 2000, after a partial moratorium on enforcement of the ordinance, defendant repealed portions of the ordinance that, among other things, outright prohibited the display of noncommercial signs and limited the display of flags. (PSMF at ¶ 5; Sign Ordinance, attach. as Ex. A to Defs.' Resp. to Pls.' Summ. J. Mot. [12].) On November 26, 2001, defendant adopted a new sign ordinance. This new ordinance allowed one real estate sign, one yard sale sign, and signs containing "noncommercial messages." The ordinance limited each residence to three signs with each sign being no higher than three feet and no larger than four square feet in size. Historic markers were permitted to be up to seven feet high and twelve and a half square feet in size. Both sides of a double faced sign counted toward the four foot limit, and yard sale signs were limited to half the size of all other signs and restricted to the day of sale. (PSMF at ¶ 6.) In the November 2001 ordinance, real estate signs were permitted to contain the words "for sale," "for lease," or "for rent," along with the name of the owner or owner's agent and a telephone contact number. Real estate signs, however, were not permitted to display the corporate logo or emblem of the agency advertising the property, or any other commercial message unrelated to the property itself. (Sign Ordinance, attach. as Ex. A to Pls.'

Mot. for Summ. J. and Statement of Material Facts Not in Dispute [42].) Seasonal displays and noncommercial announcements of occasions such as birthdays and anniversaries were also exempt from the ordinance. (PSMF at ¶ 6.) In addition to removing any non-compliant sign, the code enforcement officer and other city personnel were authorized to issue citations for any violation of the ordinance. Any such citation was to be taken to the municipal court of the City of Avondale Estates and prosecuted as any other criminal citation would be in the municipal court. (Sign Ordinance, attach. as Ex. A to Pls.' Mot. for Summ. J. and Statement of Material Facts Not in Dispute [42].)

On November 25, 2002, defendant amended its ordinance for a third time. This version of the sign ordinance repealed the three sign limit, and replaced it with a four square feet per sign, twelve square feet per lot limit. Both sides of a two faced sign no longer counted toward the size limit, and the express exemption for historic markers was eliminated. (PSMF at ¶ 7.) The ordinance devoted an entire section, § 5–376, to the display of flags. (Sign Ordinance, attach. as Ex. A to Defs.' Mot. to Amend Answer [48].) The flag section imposed proportionality requirements that required a fifteen foot "professionally fabricated flagpole" to display a 3x5 foot flag. This section also required that all flags displaying a "logo, message, statement, or commercial message" conform to all the other sign regulations contained in the ordinance. (PSMF at ¶ 7.) The November 2002 ordinance also articulated more specific criminal penalties for violations of the ordinance. Whereas earlier versions of the ordinance only provided for the issuance of citations to be taken to the municipal court of the City and prosecuted as any other criminal citation, version three of the ordinance specified that the maximum punishment for violation of the ordinance was a fine of $1,000

or six months imprisonment or both. (Sign Ordinance, attach. as Ex. A to Defs.' Mot. to Amend Answer [48].)

Defendants' fourth amendment to the sign ordinance was adopted on September 22, 2003, just seven days after the Court heard oral argument on the parties' third round of summary judgment motions. (PSMF at ¶ 8.) This version of the ordinance adjusted the proportionality requirements between flag and flagpole to allow homeowners to display flags without the use of a fifteen foot flagpole. Each residence could have up to two flagpoles displaying two flags each, except on holidays when an unlimited number of flags of any size could be displayed. (PSMF at ¶¶ 13,-15.)

The 2003 amendment also modified the seasonal display exemption to prohibit the display of seasonal decorations on the city's right of way. Seasonal displays, however, remained exempt from the ordinance's general setback provision that prohibited signs from being erected any closer than ten feet from the back of the sidewalk or fifteen feet from the edge of the road where a sidewalk does not exist. (Sign Ordinance, attach. as Ex. A to Notice of Amendment to Sign Ordinance [65]; PSMF at ¶ 8.)

The ordinance restricted residential signs to a total of twelve square feet per lot, with a per sign limitation of four square feet. As in the November 2002 version of the ordinance, only one side of a double faced sign counted toward the size limits, and signs could be no higher than three feet. (PSMF at ¶ 10.) Yard sale signs were limited to two square feet in size and could only be posted on the day of the sale. (PSMF at ¶ 21.) The real estate sign provision of the ordinance continued to limit "for sale," "for lease," or "for rent" signs to a single sign no larger than four square feet advertising the real property upon which the sign is located. (Sign Or-

dinance, attach. as Ex. A to Notice of Amendment to Sign Ordinance [65].) The ordinance also specified that any literature packets, notices, or other ancillary information on real estate signs must be displayed within the four square feet allowed for each sign face area. (PSMF at ¶ 24.)

The fifth, and most recent, amendment to the City's ordinance was adopted on March 23, 2004. (Notice of Amendment to Sign Ordinance [79].) This last set of amendments focused on the use of real estate and yard sale signs, and the seasonal display exemption. (Notice of Amendment to Sign Ordinance [79].) Though defendant has not filed anything with the Court specifically addressing these latest amendments, plaintiffs have filed a brief pleading entitled "Plaintiffs' Comment on Defendant City's Sign Ordinance Changes of March 23, 2004." [80] In this pleading, the plaintiffs indicate generally that the new amendment does not improve the City's legal position, but do not address as specifically as plaintiffs have done in previous pleadings the particular new provisions in play.

The March 2004 amendments do affect the Court's analysis. Moreover, the Court recognizes that the City's continuing amendments of its sign ordinance have always been responsive to the plaintiffs' complaints and have greatly reduced the plaintiffs' challenges as to the constitutionality of the ordinance. Thus, these amendments have had a positive effect on the litigation. Nevertheless, this unending amendment process has created a constantly moving target that has been burdensome for this Court and particularly

for the plaintiffs. Recognizing the burden on the plaintiffs that each new round of amended ordinances has created,[2] the Court has endeavored to analyze this latest ordinance by utilizing the parties' four previous rounds of summary judgment motions with their accompanying responses and replies. Hopefully, these pleadings have adequately presented all of both parties' issues to the Court for resolution. If they have not, however, the Court will be open to a motion for reconsideration as to any matters it may have missed. Nevertheless, to advance the ball in this case, the Court will evaluate the City's ordinance as of the date of this Order and indicate its position concerning the constitutionality of remaining provisions. For the most part, previous provisions of the ordinance that have been eliminated from, or modified by, the current version of the ordinance will not be addressed by the Court.

**B. Key Provisions of the Current Ordinance**

As of November 28, 2003, plaintiffs challenged the following sections of the City's ordinance:

a. § 5–375(a)(2)–limiting signs to *three feet in height;*

b. § 5–380(a)–limiting signs to *four square feet per sign and twelve square feet per lot;*

c. § 5–374(a)–requiring signs to be *set back ten feet from the back of the sidewalk or fifteen feet from the edge of the road* where there is no sidewalk;

d. § 5–372(e)–*banning signs on the public right of way;*

**2.** Given the Supreme Court's decision in *Buckhannon Bd. and Care Home, Inc. v. West Virginia Dep't of Health & Human Resources,* 532 U.S. 598, 605, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001), that a plaintiff no longer obtains prevailing party status just by being a catalyst for change, the Court has been reluctant to further burden the plaintiff by requir-

ing more briefing. Having noted the existence of *Buckhannon,* however, the Court does not rule in advance that plaintiffs would not necessarily receive some attorney's fees in these unique circumstances, even if the defendant City prevailed in all regards, which it has not done.

e. § 5–363(f)–exemption for *seasonal displays and decorations;*

f. § 5–362–*defining* commercial message, real estate sign, and sign;

g. § 5–380(a)(1)–restricting *real estate signs;*

h. § 5–380(a)(4)–regulating *yard sale signs;*

i. § 5–370–*grandfathering signs* that were lawful as of January 26, 1987.

(Pls. Filing of List of Challenged Ordinance Sections [72] ("Pls.' Filing").)

The Court will summarize these and other key provisions of the ordinance as they now stand after the March 2004 amendments. In doing so, the Court directs its attention to those provisions of the ordinance applicable to residential signage, which is the subject matter focus of plaintiffs' complaint.

Section 5–361(a) of the City's ordinance contains a clear statement of purpose:

In order to protect the public safety, including traffic safety, to assure aesthetic harmony and compatibility of signs with surrounding land uses, to enhance the business and economy of the city, to protect the public investment in streets and highways, to maintain the tranquil environment of residential areas, to promote industry and commerce, and to provide for orderly and reasonable display of advertising for the benefit of all its citizens, recognizing that the city is one of the country's foremost planned communities and is on the National Register of Historic Places, the governing authority finds that the improper control of signs would be detrimental to the unique characteristics of the city. The governing authority thus determines that the public health, safety and welfare require the adoption of this article.

This statement of purpose goes on to characterize signs as a "valuable medium of communication" and a "proper and necessary use[ ] of private property." (Sign Ordinance at § 5–361(b), attach. as Ex. A to Notice of Amendment to Sign Ordinance [65].) However, the statement of purpose also recognizes that the same characteristics that make signs a valuable medium of communication, "can distract motorists and pedestrians, thus creating traffic hazards." (*Id.*) The statement also notes that, "the clutter created by an excess in number, size and height of signs creates a distraction to travelers and negatively impacts the general appearance of an area." As a consequence, the governing authority finds that, "signs and advertising should be reasonably regulated in the interest of traffic safety, aesthetics and public welfare by the establishment of standards for the location, size, illumination, number, construction and maintenance of all signs and advertising structures in the city." (*Id.* at § 5–361(d).)

The ordinance defines the terms "commercial message," "real estate sign," and "sign," as follows:

*Commercial message* means any message that promotes a business or attempts to generate good will for a business; any message that advertises a product or service for sale; and any message that proposes a commercial transaction. *Any sign containing any commercial message shall be regulated as a commercial sign.*

*Real estate sign* means a sign erected by the owner, or the owner's agent, advertising the real property upon which the sign is located for rent, lease or sale or notifying prospective purchaser or lessors that the property has been sold or leased and identifying the owner's agent and providing contact information for same and any other information required by law.[3]

---

3. This definition of "real estate sign" was a part of the March 23, 2004 amendments.

*Sign* means any letter, figure, character, mark, plane, point, marquee sign, design, poster, pictorial, picture, stroke, stripe, line, trademark, reading matter or illuminated service, which shall be so constructed, placed, attached, painted, erected, fastened or manufactured in any manner whatsoever, so that the same shall be used for the attraction of the public to any place, subject, information, person, firm, corporation, public performance, article, machine or merchandise whatsoever which is displayed in any manner whatsoever whether outdoors or indoors in such a manner as to be visible from any sidewalk, public street, or right-of-way.

(*Id.* at § 5–362) (emphasis added).

Per the terms of the ordinance, "no signage other than house number, original house designation, street identification number, real estate sign, security identification sign, yard sale sign, or sign containing a noncommercial message shall be allowed on any residential property in the city." (*Id.* at § 5–380(a).) In residential districts, even these allowed signs may not exceed three feet in height. (*Id.* at § 5–375(a)(2).) Other than a yard sale sign or real estate sign, signs containing commercial messages are not allowed on residential property. (*Id.* at § 5–380(a).) In addition, no sign may have a total sign face area larger than four square feet. (*Id.*) All residential property is limited to a total of twelve square feet of sign face per lot, but only one side of a double-faced or project-ing sign counts toward the twelve square feet limit. (*Id.* at § 5–380(a)(2).) The ordinance contains a separate provision indicating:

In the event that a court of competent jurisdiction declares that the provision [restricting total square feet of sign face per lot to twelve square feet] as applied to political or campaign signs is unconstitutional or invalid by judgment or decree, it is the intention of the governing authority that said subsection shall be considered severed from this section as applied to political or campaign signs, but [ ] continue to apply to all other signs.

(*Id.* at § 5–380(a)(3).)

In addition, no sign may be erected in a manner which blocks from view any traffic sign, street sign, or signal. (*Id.* at § 5–375(a)(6).) The ordinance also contains specific guidelines for the use of real estate signs that state:

There shall be a limit of *one real estate sign per residential lot.* It shall be subject to the same size, setback and height provisions governing signs on residential lots. However, *a separate sign structure containing literature packets or ancillary information* such that (sic.) *pertaining to reduced price, under contract or sold status may be placed on a lot,* provided that it otherwise meets the size, height and setback provisions for signs on said lot. Real

(Sign Ordinance at Section 2, attach. as Ex. A to Notice of Amendment to Sign Ordinance [79].) Prior to the March 2004 amendments the definition was:

Real estate sign means a sign erected by the owner, or the owner's agent, advertising the real property upon which the sign is located for rent, lease or for sale and the total area of each sign face shall be no larger than 4 square feet. Such signs may contain the words "for sale," "for lease," or "for rent" together with the name of the owners or owner's agent, and telephone contact number. The signs may include a description of the property for sale or for lease, but may not contain the corporate logo or emblem of the agency advertising the property for sale or lease, or any other commercial message unrelated to the property itself.

(Sign Ordinance at § 5–362, attach. as Ex. A to Notice of Amendment to Sign Ordinance [65].)

estate signs and ancillary real estate signs shall be removed within 5 days of the sale or lease of the property upon which they are situated.[4]

(Sign Ordinance at Section 3, attach. as Ex. A to Notice of Amendment to Sign Ordinance [79] ) (emphasis added).

The same section addressing the use of real estate signs also addresses the use of yard sale signs. The yard sale sign guidelines provide:

> One *yard sale, garage sale, or estate sale* sign, subject to the size, height, and setback restrictions provided elsewhere for signs on residential lots, may be displayed on the premises where a yard sale is to be conducted *beginning 5 days before the date of the sale.* Said signs must be removed when the sale is terminated. The governing authority considers such sales to be a part of the incidental occupation of the residential

property and permissible limited commercial activity under this ordinance.[5]

(*Id. at* Section 5) (emphasis added).

All signs, whether for noncommercial, real estate, or yard sale purposes must be placed at least ten feet back from the back of the sidewalk or fifteen feet from the edge of the road nearest to the sign where a sidewalk does not exist. (Sign Ordinance at § 5–374(a), attach. as Ex. A to Notice of Amendment to Sign Ordinance [65].) Similarly, all signs, unless otherwise exempted or placed upon the right of way by governmental authority, are barred from the public right of way.[6] (Sign Ordinance at Section 6, attach. as Ex. A to Notice of Amendment to Sign Ordinance [79].)

Seasonal displays are not exempted from the ordinance's prohibition on placing signs on the public right of way; the September 2003 amendments deleted a previous exemption. However, seasonal displays continue to retain significant ex-

---

4. These guidelines for the use of real estate signs were a part of the March 23, 2004 amendments. (Sign Ordinance at Section 3, attach. as Ex. A to Notice of Amendment to Sign Ordinance [79].) Prior to the March 2004 amendments the ordinance provided: There shall be a limit of one real estate sign per lot. Any literature packets, notices such as under contract, reduced price, new price or other ancillary information on real estate signs must be displayed within the prescribed 4 square feet allowed for each sign face area. (Sign Ordinance at § 5–380(a)(1), attach. as Ex. A to Notice of Amendment to Sign Ordinance [65].)

5. These guidelines for the use of yard sale signs were a part of the March 23, 2004 amendments. (Sign Ordinance at Section 5, attach. as Ex. A to Notice of Amendment to Sign Ordinance [79].) Prior to the March 2004 amendments the ordinance provided: One yard sale sign may be displayed on the premises where a yard sale is being held on the day of the sale only. The governing authority considers yard sale signs to be a

part of the incidental occupation of the residential property and permissible limited commercial activity under this ordinance. The area of each yard sale sign face shall not exceed 2 square feet and shall comply with all other provisions of this ordinance. (Sign Ordinance at § 5–380(a)(4), attach. as Ex. A to Notice of Amendment to Sign Ordinance [65].)

6. These guidelines for the use of the public right of way were a part of the March 23, 2004 amendments. (Sign Ordinance at Section 6, attach. as Ex. A to Notice of Amendment to Sign Ordinance [79].) Prior to the March 2004 amendments the ordinance provided: The following types of signs or advertising devices are prohibited in all zoning districts of the city, unless otherwise indicated ... Signs on public right-of-way except signs exempt under the Ordinances of the City of Avondale Estates. (Sign Ordinance at § 5–372(e), attach. as Ex. A to Notice of Amendment to Sign Ordinance [65].)

emptions under the current version of the ordinance. Specifically, as long as they do not contain commercial messages, "[s]easonal displays and decorations located within the city, including but not limited to Halloween, July 4th, Christmas, Hanukkah, Kwanzaa, and Easter," are exempt from the ordinance's height and size limitations. (Sign Ordinance at § 5–363(f), attach. as Ex. A to Notice of Amendment to Sign Ordinance [65].) In addition, seasonal displays and decorations are exempt from the ten and fifteen feet setback provisions of the ordinance. (*Id.*) However, those who wish to display flags must still comply with the guidelines laid out in the special flag section of the ordinance.

With regard to the display of flags in residential districts, the ordinance requires that all flags be displayed on "purpose-built, professionally fabricated flagpoles" that do no exceed twenty-five feet in height or the height of the primary structure on the lot, whichever is less. The maximum flag size for pole heights up to twenty-five feet is twenty-four square feet, and, absent a special land use permit or variance, each lot is allowed a maximum of two flagpoles. (*Id.* at § 5–376(a)–(c).) The ordinance also contains proportionality requirements requiring that the hoist side of the flag not exceed 20% of the vertical height of the flagpole. (*Id.* at § 5–376(b).) This proportionality requirement is modified somewhat for mast arm flagpoles, i.e., staffs extending at an angle from a building. (*Id.* at § 5–376(j).) For a mast arm flagpole, the hoist side of the attached flag may be 60% of the length of the flagpole. (*Id.*) The ordinance goes on to specify that, "[f]lags displaying a logo,

message, statement or expression relating to commercial interests, and banners not meeting the definition of a flag contained in Section 5–362 must conform to all applicable ordinances pertaining to signs."[7] (*Id.* at § 5–376(e).) The ordinance continues by saying that, "[n]othing contained in this section shall be interpreted to prohibit or restrict the right to display eligible flags as banners or noncommercial signage as allowed elsewhere in the Code of Ordinances of the City of Avondale Estates." (*Id.* at § 5–376(I).) On officially designated county, state, or federal holidays, flags can be of an unlimited size and number.[8] (*Id.* at § 5–376(h).)

For all signs, in a provision referred to by both parties as the "grandfathering" clause, the ordinance provides, "[s]igns lawfully existing on the effective date of the ordinance, January 26, 1987 ... which do not conform to the provisions of this article shall be deemed to be non-conforming signs and may remain, except as otherwise specifically qualified by this article." (*Id.* at § 5–370.) This grandfathering provision has been the center of the parties' debate over a historical marker and condominium sign currently on display in the City.

In addition to its substantive provisions directing the use of signs, the current version of the ordinance contains a severability provision which provides:

It is hereby declared to be the intention of the governing authority that the sections, paragraphs, sentences, clauses and phrases of the Sign Ordinance are severable, and if any phrase, clause, sentence, paragraph or section of this ordinance

---

7. The ordinance's definition of flag states, "[f]lag means a piece of fabric or other flexible material solely containing distinctive colors, patterns, standards, words or emblems." (Sign Ordinance at § 5–362, attach. as Ex. A to Notice of Amendment to Sign Ordinance [65].)

8. The ordinance allows any noncommercial flags on this or any day. Thus, if a resident wishes to erect, on the Fourth of July, twenty flags depicting a hammer and sickle, he may do so.

shall be declared unconstitutional or invalid by judgment or decree of any court of competent jurisdiction, the unconstitutional or invalid phrase, clause, sentence, paragraph shall be struck and the remaining, phrases, clauses, sentences, paragraphs, and sections shall be effective as if the unconstitutional or invalid portion had not existed.

(*Id.* at § 5–382(a).)

The maximum punishment for violating the City's ordinance is a fine of $1,000, six months imprisonment, or both. (*Id.* at § 5–381.)

### C. The Parties

Plaintiffs Katharine Kennedy and Daniel Waggoner are residents and registered voters of the City of Avondale Estates. (Am. Compl. [34] at ¶ 3.) These plaintiffs aver that they "desire to engage in their rights of freedom of speech, enjoyment and use of their property, and to participate in the political process without unlawful interference by defendants." (*Id.*) These plaintiffs desire to support political candidates and to advocate their views on issues by displaying signs at their residences. (*Id.* at ¶ 37.) Plaintiff Anne Keating is a licensed and practicing real estate agent who has done business in Avondale Estates and who wishes to do so in the future without interference with her right to engage in commercial speech. (*Id.* at ¶ 3.) She regularly advertises her business and the availability of her clients' property for purchase by placing signs on the clients' property. (*Id.* at ¶ 38.)

Defendant, the City of Avondale Estates, is a political subdivision of the State of Georgia. It has the power to sue and be sued in its own name. (*Id.* at ¶ 4.) Defendant John Parker is the city manager-police chief of Avondale Estates. (*Id.* at ¶ 5.) He enforces the sign ordinance by informing residents to remove signs and by directing other officials in their enforce-ment of the ordinance. (*Id.*) Defendant Lyda Steadman is the city clerk-treasurer; she directs the code enforcement officer and has the authority to assign other city employees to enforce the sign ordinance. (*Id.* at ¶ 6.) Defendant Craig A. Mims is the code enforcement officer; he contacts persons to inform them to remove signs and issues summons for sign violations. (*Id.* at ¶ 7.) Defendants Parker, Steadman, and Mims are sued in their official capacity only. (*Id.* at ¶¶ 5–7.)

### II. Procedural History

The original complaint in this case was filed on July 20, 2000. (Compl. [1].) On June 14, 2002, plaintiff's original complaint was amended to reflect changes resulting from defendants' adoption of a new sign ordinance on November 26, 2001. (Am. Compl. [34].) On September 26, 2002, the plaintiffs filed a motion for summary judgment as to this newly enacted ordinance. (Pls.' Mot. for Summ. J. and Statement of Material Facts Not in Dispute [42].) On August 28, 2003, the Court ordered oral arguments on Plaintiffs' Motion for Summary Judgment [42], Defendants' Motion to Stay Summary Judgment Proceedings [44], Plaintiffs' Amended Motion for Summary Judgment and Statement of Material Facts Not in Dispute [51], and Defendants' Cross Motion for Summary Judgment [55]. (Order [57].) Due to changes in defendants' ordinance subsequent to the filing of Plaintiffs' Motion for Summary Judgment [42] and Defendants' Motion to Stay Summary Judgment Proceedings [44], both motions were denied as moot. On September 15, 2003, the Court heard oral arguments from both parties. At that hearing the Court learned that additional changes in the ordinance were imminent. On September 23, 2003, defendants filed a Notice of Amendment to Sign Ordinance [65], indicating that defendants had, in fact, amended the ordinance. Consequent-

ly, on that same day, the Court denied without prejudice Plaintiffs' Amended Motion for Summary Judgment and Statement of Material Facts Not in Dispute [51] and Defendants' Cross Motion for Summary Judgment [55]. (Order [66].) At the same time, the Court administratively terminated the action without prejudice to plaintiffs' right to re-open the action within forty-five days. (*Id.* at 6.) The Court indicated that plaintiff could reopen the action by filing a new motion for summary judgment. (*Id.*) Plaintiff elected to do so, and on November 25, 2003, the Court granted plaintiffs' motion to reopen the case. (Order [69].) The case is now before the Court on Plaintiffs' Fourth Motion for Summary Judgment [71], Defendants' Cross Motion for Summary Judgment [74], and Plaintiffs' Motion for Leave to File Supplemental Material Regarding Occurrence Subsequent to Summary Judgment Filings [81]. As noted, since the filing of these motions, the City has again amended the ordinance.

### DISCUSSION

### I. Individuals Sued in their Official Capacity

█ Plaintiffs have sued John Parker, Lyda Steadman, and Craig A. Mims in their official capacities only. (Am. Compl. [34] at ¶¶ 5–7.) At the same time, plaintiffs have asserted claims against the City of Avondale Estates directly. (*Id.* at ¶ 4.) Therefore, before discussing the merits of plaintiffs' claims, the Court will address the appropriateness of suing these individual defendants in their official capacities.

The United States Supreme Court has noted that official capacity suits, "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (citing *Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 690 n.

55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)); *see also Owens v. Fulton County,* 877 F.2d 947, 951 n. 5 (11th Cir.1989) ("For liability purposes, a suit against a public official in his official capacity is considered a suit against the local government entity he represents."). "Because suits against a municipal officer sued in his official capacity and direct suits against municipalities are functionally equivalent, there no longer exists a need to bring official-capacity actions against local government officials because local government units can be sued directly." *See Busby v. City of Orlando,* 931 F.2d 764, 776 (11th Cir.1991). Here, plaintiffs have essentially named the same defendant multiple times. Accordingly, all claims against defendants John Parker, Lyda Steadman, and Craig A. Mims are **DISMISSED** and summary judgment is **GRANTED** as to these defendants.

### II. Federal Constitutional Standards for Regulating Speech

#### A. Content–Based vs. Content–Neutral

The First Amendment provides, "Congress shall make no law...abridging the freedom of speech." U.S. Const. amend. I. To evaluate the constitutionality of a regulation challenged on First Amendment grounds as a burden on speech, the Supreme Court utilizes a two-tiered system of review. This two-tiered system begins by asking whether the regulation is content-based or content-neutral.

Content-based regulations are those that suppress, disadvantage, or impose differential burdens upon speech based upon its content. *Turner Broadcasting System, Inc. v. Fed. Communications Comm'n,* 512 U.S. 622, 642, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). Because such restrictions are presumptively invalid, *R.A.V. v. City of St. Paul,* 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), content-based speech

regulations are subject to strict scrutiny. To survive a strict scrutiny review, the State must show that its regulation is, "necessary to serve a compelling state interest and is narrowly drawn to achieve that end." *Simon & Schuster, Inc. v. Members of the New York State Crime Victims Board.*, 502 U.S. 105, 118, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991)(citing *Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 231, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987)).

■ In contrast, content-neutral regulations are unrelated to the content of the speech and apply to all speech, regardless of the message. *See Turner,* 512 U.S. at 642, 114 S.Ct. 2445. These regulations are subject to an intermediate level of scrutiny. *Id.* Intermediate scrutiny means that a content-neutral restriction on speech is valid "if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *U.S. v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). More simply put, a content-neutral restriction will survive if the government can show a reasonable basis for believing its policy will further a "substantial government interest and that the policy is the least restriction possible which would further that interest." *Artistic Entm't, Inc. v. City of Warner Robins,* 331 F.3d 1196, 1205 (11th Cir.2003). The Court's "principal inquiry in determining content neutrality ... is whether the government has adopted a regulation of speech because of [agreement or] disagreement with the message it conveys." *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). The government's purpose is the controlling consideration. *Id.* Indeed, even if a regulation has an incidental effect on some speakers and messages, but not others, the regulation may be deemed neutral if it also serves some purpose unrelated to the content of the expression. *Id.* In some cases, a regulation may appear on its face to be content-based, but, in fact, be properly classified as content-neutral because the regulation is justified by a content-neutral desire to avoid negative secondary effects of the speech. *See Hill v. Colorado,* 530 U.S. 703, 724–25, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000); *see also* ERWIN CHEMERINSKY, CONSTITUTIONAL LAW § 11.2, at 908 (2d ed.2002).

■ If a regulation is deemed to be content-neutral, then the Court must inquire whether the regulation is a reasonable time, place, or manner restriction. Courts may approve reasonable time, place, and manner restrictions as long as they are, "justified without reference to the content of the regulated speech ... they serve a significant governmental interest, and ... they leave open ample alternative channels for communication." *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 648, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981). Using the intermediate standard of review while, at the same time, considering this time, place, or manner restriction analysis, the Eleventh Circuit has created a three-step inquiry for determining the constitutionality of viewpoint neutral regulations. For a viewpoint neutral regulation of speech to be upheld the "government must show: (1) it has the constitutional power to make the regulation (2) an important or substantial government interest unrelated to the suppression of free speech is at stake, and (3) the ordinance is narrowly drawn to achieve its desired ends, leaving other channels for the communication of information." *Messer v. City of Douglasville, Georgia,* 975 F.2d 1505, 1510 (11th Cir.1992).

## B. Are All Sign Regulations Necessarily Content–Based?

In *Granite State Outdoor Adver. Inc. v. City of Clearwater, Fla.*, 213 F.Supp.2d 1312 (M.D.Fla.2002) (Moody, J.), *aff'd in part and rev'd in part on other grounds*, 351 F.3d 1112 (11th Cir.2003), the United States District Court for the Middle District of Florida recognized the "catch–22" confronting cities and municipalities who attempt to regulate signs in their communities. The same "catch–22" was recognized by another district court in this circuit in *Lamar Adver. Co. v. City of Douglasville, Georgia*, 254 F.Supp.2d 1321, 1327 n. 3 (2003) (Martin, J.). The "catch–22" of sign regulation is a product of the following logic: (1) the government may regulate and prohibit signs to further legitimate governmental interests in part because posted signs can be perceived as an aesthetic harm, *see Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 808, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984); *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 502, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981); (2) any ordinance prohibiting signs must provide an exception for "For Sale" real estate signs, because the Supreme Court has said so, *Linmark Assocs., Inc. v. Township of Willingboro*, 431 U.S. 85, 97, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977); (3) sign regulations that require the regulator to read the sign to determine whether the regulation applies are content-based, *see City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993); (4) content-based sign regulations are subject to strict scrutiny and, by virtue of this high standard, are generally found to be unconstitutional; (5) since the required exemption for "For Sale" signs necessarily requires one to read the words "For Sale," it becomes virtually impossible to draft a constitutional sign ordinance. *Granite State (Clearwater)*, 213 F.Supp.2d at 1328.

■ Yet, given the breadth of jurisprudence establishing, as substantial governmental goals, traffic safety and the appearance of a city, *see Metromedia, Inc.*, 453 U.S. at 507–08, 101 S.Ct. 2882, and given the obvious connection between sign regulations and the attainment of these goals, the Supreme Court presumably did not intend that cities and municipalities be unable to draft a constitutional sign ordinance. Nevertheless, several courts have so ruled. *See Granite State (Clearwater)*, 213 F.Supp.2d at 1328 (listing courts that have followed the "catch–22" theory). Contrary to these cases and, at the outset of this analysis, this Court rejects the proposition that a sign regulation, which requires the regulator to read the sign, in order to determine whether or not the regulation applies, is automatically content-based. This conclusion is consistent with several Supreme Court cases that have found laws which on their face drew content-based distinctions to be content-neutral laws, if these laws have a content-neutral purpose or justification. *See* Erwin Chemerinsky, Constitutional Law § 11.2, at 904–08 (2d ed.2002) (discussing *Hill v. Colorado*, 530 U.S. 703, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000); *Boos v. Barry*, 485 U.S. 312, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988); and *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986)). Thus, the Court does not embrace the catch–22 logic of some courts.

## C. Commercial Speech

Before engaging in a standard content-neutral vs. content-based analysis, the Court must also determine whether the speech at issue in a case is commercial. At its most basic, commercial speech is that which "propose[s] a commercial transaction," and it has been entitled to First Amendment protection since 1975. *Virginia State Board. of Pharmacy v. Virginia*

*Citizens Consumer Council, Inc.,* 425 U.S. 748, 762, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); *see also Bigelow v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975). Because commercial speech is entitled to less protection than noncommercial speech, however, the standard for analyzing restrictions on commercial speech is unique. Quite simply, commercial speech is subject to "modes of regulation that might be impermissible in the realm of noncommercial expression." *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 456, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978).

When confronted with a restriction on commercial speech the Court must ask itself, first, "whether the expression is protected by the First Amendment." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York,* 447 U.S. 557, 566, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). To be entitled to protection, the commercial speech "must concern lawful activity and not be misleading." *Id.* Next, the Court must determine "whether the asserted governmental interest is substantial." *Id.* If the speech is protected and the governmental interest is substantial, then the Court "must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." *Id.* The requirement that restrictions on commercial speech be no more extensive than "necessary" does not mean that the government's regulation must be the "least-restrictive-means" possible. *Board of Trs. of the State Univ. of New York v. Fox,* 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989). Instead, there must be a "reasonable fit" between the legislature's ends and the means chosen to accomplish those ends. *See id; see also City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 416, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993). The fit does not have to be the "single best disposition" but, rather, "one whose scope is in proportion to the interest served." *Id.* This requires something more than satisfying a rational-basis level of review. Indeed, "if there are numerous and obvious less-burdensome alternatives to the restriction on commercial speech, that is certainly a relevant consideration in determining whether the 'fit' between ends and means is reasonable." *City of Cincinnati,* 507 U.S. at 418 n. 13, 113 S.Ct. 1505.

### III. Standing

■ In their response to plaintiffs' fourth motion for summary judgment and brief in support of their own cross-motion for summary judgment, defendants argue that plaintiffs lack standing to challenge the definitions of "commercial message" and "sign" because, "in none of the various declarations filed in this case has any plaintiff or former plaintiff alleged that he or she has been injured by these definitions." (Defs.' Resp. at 12–13.) Defendants base their argument on the Eleventh Circuit's holding in *Granite State Outdoor Adver., Inc. v. City of Clearwater, Florida,* 351 F.3d 1112 (11th Cir.2003).

The overbreadth doctrine permits third-party standing when a statute that is constitutionally applied to a litigant, could potentially be unconstitutionally applied to third parties not before the court. In *Granite State (Clearwater),* the Eleventh Circuit held that a plaintiff asserting the overbreadth doctrine must still establish that he personally has suffered some actual or threatened injury. *Id.* at 1116. The *Granite State (Clearwater)* panel applied this holding to find that a billboard company had standing to challenge one provision of a sign ordinance and not the other. *Granite State (Clearwater)* did not change the well-settled law of standing, however. *Id.* at 1117. For standing to exist, first, there must be an injury in fact that is both "concrete and particularized" and "actual

or imminent." Second, there must be "a causal connection between the injury and the causal conduct." Finally, there must be "a likelihood that the injury will be redressed by a favorable decision." *Id.* at 1116. The "essence of the standing question ... is whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 260–61, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)(internal quotations omitted).

Here, the definition of "sign" is the very heart of the City's ordinance. Without this definition, it is impossible to know what falls under the ordinance's umbrella. Similarly, without the definition of "commercial message," it is impossible to know what signage is allowed on residential property where, "[n]o signage other than house number, original house designation, street identification number, real estate sign, security identification sign, yard sale sign, or sign containing a *noncommercial* message shall be allowed on any residential property in the city." (Sign Ordinance at § 5–380(a), attach. as Ex. A. to Notice of Amendment to Sign Ordinance [65] )(emphasis added).

Plaintiffs Waggoner and Kennedy are residents of the City who wish to participate in the political process in a manner that the current ordinance does not allow. Plaintiff Keating is a real estate agent who has done business in the City and wishes to do so in the future without the burden of the ordinance's restrictions on the posting of real estate signs. The ordinance in question clearly restricts these parties' speech. Whether it does so at a constitutionally permissible level, the ordinance has caused the parties to suffer an arguable injury. In addition, should it find the City's ordinance to be unconstitutional, plaintiffs' injuries can be adequately redressed by this Court. Finally, plaintiffs live and work under the City's ordinance, and clearly have a personal stake in the outcome of the controversy. Accordingly, the Court concludes that plaintiffs have standing and Defendants' Cross Motion for Summary Judgment [74] as to this issue is **DENIED.**

## IV. Challenged Provisions of the Avondale Estate's Ordinance

Having set out the constitutional standards applicable to sign regulations which regulate speech and having determined that plaintiffs have standing, the Court now turns to the specific provisions challenged in this case.

### A. Provisions of the Ordinance Directed at Commercial Speech

#### 1. Real Estate Signs

■ In their April 10, 2003, summary judgment motion challenging ordinance sections, plaintiffs object to the definition of "real estate sign" contained in § 5–362 of the ordinance. Plaintiffs challenge the definition on the ground that it contains multiple content limitations, including a prohibition on the posting of websites for contacting real estate sellers or their agents, that are, "not justified by any constitutional authority possessed by the city." (Pls.' Filing at 4; Pls.' Fourth Motion for Summ. J. [71] at 25 ("Pls.' Fourth").) Plaintiffs also challenge the ban on "corporate logo" contained in the definition of "real estate sign" as enforced in a discriminatory manner, undefined so as to violate due process, and contrary to regulations issued by the Georgia Real Estate Commission. (Pls.' Filing at 4–5; Pls.' Fourth at 29–32.) Further, plaintiffs challenge § 5–380(a)(1) and its requirement that any literature packets or notices

be included in the four square feet area allotted for real estate signs. (*Id.* at 5.) Lastly, to the extent that information packets count as second signs under the ordinance, plaintiffs challenge the limitation of one real estate sign per lot. (Pls.' Filing at 6.)

As previously noted,[9] subsequent to the filing of plaintiffs' fourth motion for summary judgment and list of challenged provisions, the City's ordinance was amended once again. In its latest definition of "real estate sign," this last round of amendments removes the ban on displaying corporate logos or agency emblems on real estate signs. (Sign Ordinance at Sec. 2, attach. as Ex. A to Notice of Amendment to Sign Ordinance [79].) The new definition of "real estate sign" also does not contain the previous version's ban on the posting of "any other commercial message unrelated to the property itself." (*Id.*) Presumably, this is the language that precluded real estate agents from posting their website addresses on real estate signs. The new definition of "real estate sign" goes on to provide that a real estate sign may include, not only contact information for the owner's agent, but "any other information required by law." (*Id.*) This allowance for "any other information required by law" provides ample room for real estate agents to post any information required by the Rules of the Georgia Real Estate Commission, codified as Title 520 of the Georgia Administrative Code, on their signs.

The newly amended § 5–380(a)(1) addresses another one of plaintiffs' objections to the previous version of the ordi-nance by removing the requirement that any literature packets or notices—i.e., a sign indicating the property had been "Sold"—be included in the prescribed four square feet area allotted for real estate signs. (*Id.* at Sec. 3.) The amended ordinance now provides for, "a separate sign structure containing literature packets or ancillary information such that (sic.) pertaining to reduced price, under contract or sold status may be placed on a lot, provided that it otherwise meets the size, height and setback provisions for signs on said lot." (*Id.* at Sec. 4.)

Collectively, the March 23, 2004, amendments address plaintiffs' previous objections to the ordinance's treatment of corporate logos, websites, ancillary information such as literature packets and status of sale notices, and, because the amendment does not treat ancillary information as a second sign, the limitation of one real estate sign per lot. The City, itself having addressed plaintiffs' concerns, the Court has no need to determine whether now-redacted provisions would have been constitutional.[10] Therefore, in connection with real estate signs, the only issue left for the Court to address is plaintiffs' objection to the four square feet in size and three square feet in height limitations on real estate signs. (Pls.' Filing at 4.)

Real estate signs propose a commercial transaction and are clearly commercial speech. *See Linmark*, 431 U.S. at 91, 97 S.Ct. 1614. Accordingly, the Court applies the *Central Hudson* test to determine the constitutionality of this provision of the

---

**9.** See discussion *supra* p. 1190.

**10.** In their April 23, 2004, comment on defendants' March 23, 2004, sign ordinance changes, plaintiffs had suggested that this Court examine the version of the ordinance in effect prior to the March 2004 amendment. The Court cannot, however, properly review repealed provisions. See *Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1310 (11th Cir.2000) (when a subsequent enactment replaces a challenged statute, a case is moot to the extent that the new enactment removes the challenged features of the prior law.)

ordinance. As lawful, non-misleading advertising material, real estate signs are protected by the First Amendment. This is the threshold inquiry under *Central Hudson*. Having established the protected status of real estate signs, the Court must determine whether the asserted governmental interest is substantial. Here, among other things, the City's asserted interests in regulating real estate signs are public safety, traffic safety, aesthetic harmony, compatibility of signs with surrounding land uses, orderly and reasonable displays of advertising for the benefit of all its citizens, and maintenance of tranquil residential areas. (*See* Sign Ordinance at § 5–361(a), attach. as Ex. A. to Notice of Amendment to Sign Ordinance [65].) It is well settled law that the state may legitimately exercise its police powers to maintain traffic safety and advance its aesthetic interests. *Members of the City Council of the City of Los Angeles*, 466 U.S. at 805, 104 S.Ct. 2118. The Court finds that the City's interest is substantial.

Since the speech at issue is protected and the governmental interest asserted is substantial, the Court must determine whether the ordinance restricting real estate signs to four square feet in area and three square feet in height, "directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." *Cent. Hudson*, 447 U.S. at 566, 100 S.Ct. 2343. In doing so, the Court looks only for a "reasonable fit" between the City's stated purpose and the means chosen to accomplish those ends. *Board of Trs. of the State Univ. of New York*, 492 U.S. at 480, 109 S.Ct. 3028.

Without question, the provision limiting real estate signs to four square feet in size and three square feet in height promote the City's aesthetic interests. The provision creates some continuity between the signs posted by owners and various real estate agencies, and prevents the erection of gigantic signs on some lots versus numerous smaller real estate signs on another residential lot. The City allows a uniform size, four-foot square, three-foot high sign that can contain multiple names and telephone numbers, and even a description of the property. The City adds to that an allowance for a separate sign structure containing literature packets or information pertaining to reduced price, under contract, or sold status. The City has provided ample means for potential buyers/sellers and landlords/renters to learn about the availability of residential property located in the City. Indeed, the Court finds no real barrier to the exchange of information about the sale or rental of residential property in the City. Here, there is a "reasonable fit" between the City's stated purpose and the means chosen to accomplish those ends, and our inquiry need go no further. Thus, the Court concludes that the ordinance's size and height restrictions on real estate signs are constitutional. Consequently, Plaintiffs' Fourth Motion for Summary Judgment [73] is **DENIED** and Defendants' Cross Motion for Summary Judgment [74] is **GRANTED** as to the size and height restriction on real estate signs. At the same time, the Court finds no constitutional error in the ordinance's definition of "real estate sign" and Plaintiffs' Fourth Motion for Summary Judgment [73] is **DENIED** and Defendants' Cross Motion for Summary Judgment [74] is **GRANTED** as to this issue.

### 2. Yard Sale Signs

In connection with yard sale signs, plaintiffs object to the provision allowing only one sign that is two square feet in size. This limitation was contained in the pre-March 23, 2004, version of § 5–380(a)(4). (Pls.' Filing at 6.) Plaintiffs further object to the ordinance's restriction of

the one yard sale sign to, "the premises where the yard sale is being held on the day of the sale only." (*See id.*) The March 2004 amendments removed the two square feet limit on yard sale, garage sale, and estate sale signs. (Sign Ordinance at Sec. 5, attach. as Ex. A to Notice of Amendment to Sign Ordinance [79].) The new yard sale provision now provides that these signs are subject to the same size, height, and setback restrictions provided for all other residential signs (four square feet in size, three feet in height, ten or fifteen feet setback). (*Id.*) The new provision also allows for the display of a yard sale sign on the premises where a yard sale is to be conducted beginning five days before the date of the sale. (*Id.*) The City, itself having addressed the plaintiffs' concerns over the restriction concerning the size and timing of a yard sale sign, the Court need only consider the constitutionality of restricting yard sale postings to a single sign on the premises of the sale.

Like real estate signs, but on a smaller scale, yard sale signs solicit a commercial transaction and are commercial speech. Therefore, the Court applies the *Central Hudson* test to determine the constitutionality of the yard sale provision of the ordinance. First, as lawful, non-misleading advertising material, yard sale signs are protected by the First Amendment. Second, as was the case for real estate signs, the City's stated purpose in regulating yard sale signs includes maintenance of public safety, traffic safety, and aesthetic harmony. (*See* Sign Ordinance at § 5–361(a), attach. as Ex. A. to Notice of Amendment to Sign Ordinance [65].) Third, the state may legitimately exercise its police power to maintain safety and advance its aesthetic interests, and the City's interest in doing so is substantial. *See Members of the City Council of the City of Los Angeles,* 466 U.S. at 805, 104 S.Ct. 2118. Because the speech at issue is protected and the governmental interest asserted is substantial, the Court must determine whether the ordinance restricting yard sale signs to a single sign posted on the premises where the sale will occur, "directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." *Cent. Hudson,* 447 U.S. at 566, 100 S.Ct. 2343. Once again, the Court looks only for a "reasonable fit" between the City's stated purpose and the means chosen to accomplish those ends. *Board of Trs. of the State Univ. of New York,* 492 U.S. at 480, 109 S.Ct. 3028.

As was the case for real estate signs, the one yard sale sign limit promotes the City's aesthetic interests. The provision prevents those conducting a yard sale from erecting numerous yard sale signs on their residential lot. The provision also keeps those conducting a yard sale from blanketing the streets with directional signs to a yard sale that may, in addition to being unsightly, distract and confuse traffic. For five days before the date of a yard sale, the residential lot where the sale will be held may display a sign advertising the sale for all the world to see. If those holding yard sales feel that one yard sale sign posted for five days does not adequately promote their event, they are free to advertise by other means. To maintain the aesthetics of a community, a city, "must be given discretion in determining both the best method of achieving that goal and the degree of protection necessary." *Don's Porta Signs, Inc. v. City of Clearwater,* 829 F.2d 1051, 1053 (11th Cir.1987)(internal citation omitted). Granting the City its due discretion, the Court finds there is a "reasonable fit" between the City's stated goal of preserving traffic safety and aesthetic harmony and its regulation of yard sale signs. The ordinance's number and location restriction on yard sale signs is constitutional. Accordingly, Plaintiffs' Fourth Motion for Sum-

mary Judgment [73] is **DENIED** and Defendants' Cross Motion for Summary Judgment [74] is **GRANTED** as to the number and location restrictions on yard sale signs.

Having determined the constitutionality of those provisions of the ordinance directed at commercial speech, the Court now turns its attention to plaintiffs' challenges to provisions of the ordinance that are directed at noncommercial speech.

### B. Provisions of the Ordinance Directed at Noncommercial Speech

#### 1. General Size, Height, Number, and Setback Restrictions Are Content–Neutral

The City's ordinance currently provides, "[f]or all property located in a residential district, there shall be a total maximum of twelve square feet of sign face per lot. For projecting or double-faced signs each display face shall not be added together in computing the area of the sign face for that sign." (Sign Ordinance at § 5–380(a)(2), attach. as Ex. A to Notice of Amendment to Sign Ordinance [65].) The ordinance restricts all signs allowed in residential zoning districts to a total sign face area no greater than four square feet. (*Id.* at § 5–380(a).) The maximum height for any residential sign is three feet, measured from the ground level to the top of the sign. (*Id.* at § 5–375(a)(2).) The ordinance goes on to state, "[n]o sign shall be constructed, erected, used, operated or maintained ... in any residential district, within 10 feet from the back of the sidewalk or within 15 from the edge of the road nearest to the sign where a sidewalk does not exist." (*Id.* at § 5–374(a).)

Taken together, these provisions mean that individuals who choose to make their signs the maximum four square feet in size are entitled to three such signs on their lot. If they choose to post smaller signs, residents may have more than three signs per yard.[11] Information can be posted on both sides of these three signs, but no sign can be higher than three feet. Depending on whether there is a sidewalk, all signs would need to be set back either ten or fifteen feet. (*Id.*)

These restrictions concerning the size and number of signs are content-neutral. That is, the size and number restrictions on signs do not vary depending on what words are written on them. A resident who wishes to express the view, "War is not the answer," can erect the same number and the same size signs as a resident whose signs caution the reader to "Repent or burn in hell." All residents can erect signs, regardless of the message communicated by these signs, as long as the signs are not higher than three feet, as long as the total square feet of the signs, collectively, do not exceed 12 square feet, and as long as no one sign exceeds four square feet in its dimensions.

Because the restrictions concerning signs are content-neutral, the Court utilizes intermediate scrutiny to review these rules. To survive a review based on intermediate scrutiny, the government must show a reasonable basis for believing its policy will further a "substantial government interest and that the policy is the least restriction possible which would further that interest." *Artistic Entm't, Inc.,* 331 F.3d at 1205. The asserted governmental interest must be unrelated to the suppression of free speech. *See U.S. v. O'Brien,* 391 U.S. at 377, 88 S.Ct. 1673. The government's purpose in enacting the

---

11. The Court takes judicial notice that although there can be many different and larger sizes of political campaign signs, a "typical" size sign is three square feet, meaning that, at any one time, a resident could post four of these signs. *See* discussion *infra* at 1207 – 1208.

regulation is the controlling consideration. *See Ward,* 491 U.S. at 791, 109 S.Ct. 2746. In addition, because the challenged height, size, number, and setback provisions are content-neutral, the Court must inquire whether these provisions are reasonable time, place, or manner restrictions. In the end, for a viewpoint neutral regulation to be upheld, the "government must show that: (1) it has the constitutional power to make the regulation (2) an important or substantial government interest unrelated to the suppression of free speech is at stake, and (3) the ordinance is narrowly drawn to achieve its desired ends, leaving other channels for the communication of information." *Messer,* 975 F.2d at 1510.

Because the ordinance's height, size, and number restrictions are interdependent, the Court will begin its inquiry with these provisions of the ordinance. The Court will then address the setback provisions separately.

### a. Height, Size, and Number Restrictions

■ Plaintiffs have objected to § 5–375(a)(2) limiting signs to three feet in height and § 5–380(a) limiting signs to four square feet per sign and twelve square feet per lot. (Pls.' Filing at 1.) The effect of the per sign size restriction is an implicit limit on the number of signs that can be posted, and plaintiffs object to this as well.

For these content-neutral restrictions to be upheld, first, the government must show it has the constitutional power to make the regulations. Here, the City has proscribed limits on the height, size, and number of residential signs in order "to

protect the public safety, including traffic safety" and to "assure aesthetic harmony." (Sign Ordinance at § 5–361(a), attach. as Ex. A to Notice of Amendment to Sign Ordinance [65].) The government's power to regulate for such interests is well established, and traffic safety and aesthetics are substantial government goals. *See Messer,* 975 F.2d at 1510. Indeed, "[w]hile signs are a form of expression protected by the Free Speech Clause, they pose distinctive problems that are subject to municipalities' police powers." *Ladue v. Gilleo,* 512 U.S. 43, 48, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994). Consequently, the City easily satisfies the constitutional power requirement. At the same time, the City demonstrates that an important or substantial government interest is at stake. The focus of the Court's inquiry thus becomes, whether the ordinance's provisions on height, size, and number of signs are narrowly drawn to achieve the desired ends of public safety and aesthetic harmony while leaving open alternative channels of communication.

The Constitution does not set out guidelines for the practical implementation of its provisions. Instead, courts are left to wander through an often undispositive labyrinth of case precedent [12] in search of answers to very mundane kinds of questions, such as those now before this Court. Indeed, the dissonance between the lofty rhetoric of First Amendment analysis and the tedious line-drawing of actual implementation is quite striking. Namely, in the area of sign regulations, how many signs does the Constitution entitle the typical residential lot to display? If it is not an unlimited number, then is the correct

---

**12.** Judge Moody aptly noted, "It is truly a Herculean task to wade through the mire of First Amendment opinions to ascertain the state of the law relating to sign regulations, beginning with the Supreme Court's leading decision on billboard regulations in *Metrome-* *dia* [Rehnquist, J., dissenting, who referred to the plurality decision as a 'virtual Tower of Babel, from which no definitive principles can be clearly drawn']." *Granite State (Clearwater),* 213 F.Supp.2d at 1327 (internal citation omitted).

number three? Four? Ten? Is a square footage restriction of four square feet per sign too restrictive? If so, what will pass constitutional muster? Will six square feet do it? Or is ten feet the right number? Ultimately, these types of discussions sometimes sound more like the talk of an interior decorator or landscape architect than like the language typically used by judges in other types of legal analyses.

In the end, although courts strive to do their best to properly apply abstract constitutional standards, their final determinations along these lines are necessarily arbitrary. A sign that might seem unconstitutionally small to one reviewer could seem ample to a different observer. At oral argument, upon the Court's inquiry of what dimensions would satisfy the plaintiffs, plaintiffs' counsel indicated that fifteen or sixteen square feet of total sign allotment, without the four square feet per sign limit, would probably, "get rid of everybody's problems." (Tr. of Oral Argument, Sept. 15, 2003, at 26.) In other words, if Avondale would allow four (4) signs that are four square feet in size, instead of three (3) such signs, or if it would allow one gigantic sign in a lot, instead of four smaller signs, then much of plaintiff's constitutional concerns would dissipate.

In *Granite State Outdoor Adver., Inc. v. City of St. Petersburg, Florida*, 348 F.3d 1278, 1280 (11th Cir.2003), the Eleventh Circuit, without discussion, affirmed the district court's severance of a provision limiting the maximum size of a "free speech" sign to four square feet, where the same ordinance had permitted political signs to be six square feet. (*See Granite State Outdoor Adver., Inc. v. City of St. Petersburg, Florida*, 8:01–CV–2250–T– 30MSS (M.D.Fla.)(Moody, J.), attach. as Ex. C to Defs.' Cross Mot. for Summ. J. [74].) As it was this differentiation between the permitted sizes of different signs, based on their content, that prompted the ordinance to lose its content-neutral status, the *St. Petersburg* decision does not answer the question of how large a sign a regulation must permit to be deemed constitutional. (*Id.* at 36.) In contrast to *St. Petersburg*, the City here treats free speech and political signs equally.

The Court does note that *St. Petersburg's* allowance of a six square feet limit on signs was upheld by the Eleventh Circuit. Indeed, *St. Petersburg* held that a six square feet per sign area limitation is rationally related to a city's stated purpose of preserving safety and visual harmony, and constitutionally permissible. (*See id.* at pp. 34, 36.)

As to whether four square feet is too restrictive, plaintiffs cite to *Verrilli v. Concord*, 548 F.2d 262 (9th Cir.1977). In *Verrilli*, the municipality in question had permitted only one political sign, not to exceed four square feet, in any one residential lot. *Id.* at 265. The Ninth Circuit struck down this provision, among others, of the ordinance, noting that the city had not justified this restriction. *Id.* at 266. Nevertheless, one member of the panel dissented, quoting from another Ninth Circuit case to the effect that while the City's "legitimate interest might be served as well by slightly less restrictive size limitations,... [s]uch distinctions in degree become significant only when they can be said to amount to differences in kind." *Id.* at 267, citation omitted (Kilkenny, concurring and dissenting). The dissenter went on to state: "The Constitution should not be used as a tool to create distinctions where none exist.... Surely, the majority here has not given 'general allowance ...(to the) municipal preferences' expressed by the [city]." *Id.*

With the sparse case authority cited by the parties in mind and with the Court's recognition of the unique and important

role that residential signs play in allowing individuals to convey religious, political, and other personal messages, *see Ladue,* 512 U.S. at 54–55, 114 S.Ct. 2038, the Court considers whether the ordinance's restrictions on height, size, and number of signs are narrowly drawn to achieve the desired ends of public safety and aesthetic harmony, while leaving open alternative channels of communication.

In determining the constitutionality of the restrictions, the Court is mindful that it should try to avoid mistaking its own personal judgment of the proper sign size as being synonymous with the standards that are imposed by the Constitution. To avoid that temptation, the Court searches for some objective measure.[13] Although the parties brought into oral argument, at the Court's request, some hand-made signs to show how big different sized signs are, the parties offered no further visual demonstration of the impact of the sign ordinance on lawn signs. The Court has obtained what it considers to be a campaign sign typical in size to campaign signs displayed in many residents' yards during election season. *See* Court's Exhibit 1. This sign is three square feet in size,[14] meaning that a resident could post four such campaign or four such "free speech" signs in his yard at any one time.

Certainly, limiting the number, size, and height of signs serves the desired ends of aesthetic harmony and public safety. Yards that are less littered with signs will look neater than yards that are more cluttered. A gigantic sign can be an eyesore that diminishes the tranquil, residential

quality of a neighborhood and that tends to undermine the consistency and aesthetics of the area. Large signs can also be a distraction for passing traffic.

Is the restriction drawn narrowly enough, however? This is another way of asking whether the ordinance should allow more, or bigger, or taller signs. Again, trying to tie this question to some more objective measure, the Court notes that the ordinance allows four "typical" sized campaign signs. Is that enough? The Court is unsure. Certainly, a resident might wish to support more than four candidates in a given election. Yet, if one determined that a resident should be allowed an unlimited number of campaign signs, one then would have to allow an unlimited number of "free speech" signs, as an ordinance cannot make a distinction between different kinds of noncommercial speech. Thus, a rule that requires an unlimited number of campaign signs is a rule that effectively means there can be *no* valid restriction on the number of signs in a residential yard.[15] Thus, were one to say that an ordinance must allow an unlimited number of campaign signs, one would also be saying that there could be no valid ordinance restricting the number of signs in a residential yard. The parties have cited no case authority that categorically forbids such ordinances.

If, then, one can envision a proper ordinance restricting the number of signs, that means that there must be some limitation on the number of signs that would be a constitutionally acceptable restriction.

13. Defendants argue that the size limitations on signs are permissible because street signs in the city have lettering of three inches or less in height and still serve their intended function. (Defs.' Resp. at 8.) Given the setback requirements of the ordinance, the Court is not persuaded that the City's analogy to street signs is apt, however.

14. The sign is two feet by one and a half feet in size, or three square feet.

15. An ordinance could conceivably provide for an unlimited number of signs, of any type, during a campaign season. As the Avondale ordinance *does not so provide,* the parties have not briefed the legitimacy of such an ordinance.

Were the Court drafting its own legislation, it might have allowed more than four signs—plaintiffs effectively seek only five—but it cannot offer any particularly persuasive reason why one number is allowed by the Constitution and the other is not. Residents who support more than four candidates have the option of rotating their signs to show their support. Just as a television advertisement can only advocate one candidate at a time, a sequential expression of First Amendment political speech, via rotating yard signs, does not seem constitutionally out of line.

As to the size and height limitations, it is true that these restrictions prevent a resident from displaying a large sign.[16] It is also true that occasionally a resident may want to "shout" his message, via a large sign. Yet, just as the First Amendment permits speech, but allows restrictions on excess noise, *Kovacs v. Cooper*, 336 U.S. 77, 78, 69 S.Ct. 448, 93 L.Ed. 513 (1949), the Court assumes that a resident can be restricted in his ability to visually shout his message. That is, the First Amendment may allow one to have a party; it does not permit one to disturb his neighbors with loud music.

For all the above reasons, the Court concludes that the ordinance's size and height restrictions on signs (§ 5–375(a)(2) and § 5–380(a)) is not unconstitutional. Therefore, with respect to this part of plaintiffs' argument, Plaintiffs' Fourth Motion for Summary Judgment [71] is DE-NIED and Defendants' Cross Motion for Summary Judgment [74] is **GRANTED**. In reaching these conclusions of law, the Court has had cause to evaluate and consider the ordinance's definition of "sign" and, in doing so, has found no constitutional error in the ordinance's definition of "sign." Accordingly, Plaintiffs' Fourth Motion for Summary Judgment [73] is **DENIED** and Defendants' Cross Motion for Summary Judgment [74] is **GRANTED** as to the definition of "sign."

**b. Setback Provision**

■ Currently, per § 5–374(a), signs must be set back ten feet from the back of the sidewalk or, where a sidewalk does not exist, fifteen feet from the edge of the road nearest to the sign. In this case, the City established the setback provision because the width of the city's right of way varies from street to street. Cities clearly have the right to prohibit the erection of private signs on their right of way.[17] *See Members of the City Council of the City of Los Angeles*, 466 U.S. at 814–815, 104 S.Ct. 2118. By creating the standardized setback provisions in the face of varying public right of ways, the City hoped to create a quick and efficient means for residents to determine how far back from the road they need to go before posting their signs. (*See* Defs.' Resp. at 8.) The distance is sufficiently long enough to ensure that signs do not block the view of traffic or

---

16. Actually, only the height restriction imposes a substantial limit and this limit is a vertical limit. The Court does not read the ordinance to forbid a resident from lining four signs close to each other, so that a longer message could be spelled out horizontally, notwithstanding the limitation of four square feet per sign. The Court sincerely hopes that its mention of this potential "loophole," however, does not prompt Avondale to again amend its ordinance for a sixth time.

17. The Court's conclusion that cities have the right to prohibit the erection of signs on their right of way directly addresses plaintiffs' challenge to § 5–372(e). (*See* Pls.' Filing at 2 (challenging § 5–372(e)'s ban on signs on the public right of way).) To the extent this challenge forms part of the parties' cross-motions for summary judgment, Plaintiffs' Fourth Motion for Summary Judgment [71] is **DENIED** as to the ban on posting signs on the public right of way and Defendants' Cross Motion for Summary Judgment [74] is **GRANTED** as to the same issue.

otherwise obstruct intersections, but short enough for those passing or driving by to still be able to read yard signs. Once an individual has complied with the applicable ten or fifteen feet setback provision, he is free to post anywhere else in the yard. Accordingly, the Court is satisfied that the setback provision is narrowly drawn to achieve its desired end, with one exception.

 Currently, under § 5–363(f), seasonal displays and decorations are exempt from the setback provisions. *See* discussion *infra.* While the Court upholds this exemption to the extent that a seasonal display might exceed the height and size restrictions of signs, *see infra,* the Court find nothing in the record to justify or explain the setback exemption for seasonal items. That is, if the City does not wish a sign near its right of way, because of traffic and visibility concerns, allowing a large Santa near the sidewalk would seem to pose the same problems. Accordingly, the Court holds the City's ordinance's exempting seasonal displays and decorations from the setback provision to be unconstitutional. The City is enjoined from enforcing the setback provision against any sign until such time as the unconstitutional exemption for seasonal displays and decorations is removed from the ordinance.

Plaintiffs' Fourth Motion for Summary Judgment [71] is therefore **GRANTED** as to the seasonal display exemption from the setback provision and **DENIED** as to the general setback provision of § 5–374(a) and Defendants' Cross Motion for Summary Judgment [74] is **DENIED** as to the seasonal display exemption from the setback provision and **GRANTED** as to the general setback provision of § 5–374(a).

## 2. Exemption of Seasonal Displays and Decorations

### a. Seasonal Display Exemption

Even if defendants' restriction on the number and size of signs is otherwise constitutional, plaintiffs argue that it cannot stand because it makes no similar restriction on the number and size of seasonal displays. As plaintiffs colorfully note, while a resident is limited to a set number of signs, depending on the size of the signs, he is allowed an unlimited number of Easter bunnies on his yard. (Pls.' Br. in Supp. of Am. Mot. for Summ. J. [51] at 13.) In essence, plaintiff is contending that the City is treating two different kind of noncommercial speech differently, depending on the content of the message.

Section 5–363(f) defines "seasonal displays and decorations" as "including but not limited to Halloween, July 4th, Christmas, Hanukkah, Kwanzaa, and Easter . . . ." (Sign Ordinance at § 5–363(f), attach. as Ex. A to Notice of Amendment to Sign Ordinance [65].) The seasonal display or decoration cannot contain "commercial messages," however. *Id.* This section effectively exempts these seasonal displays and decorations from the height, size, and numerosity restrictions applicable to signs.[18] *Id.* Further, while these decorations cannot be on the right of way, they are also implicitly exempted from the setback provision of § 5–374(a) applicable to traditional signs. *Id. See* discussion *supra* at 1194.

Clearly, the City's exemption of holiday decorations does not discriminate based on the holiday being celebrated; any holiday or seasonal celebration will do. Plaintiffs argue, however, that by failing to subject seasonal displays and decorations to the same height, number, size, and setback

---

**18.** Section 5–363(f) also provides that, like other noncommercial messages, "seasonal displays and decorations" do not require a permit.

restrictions as other more traditional "signs," the Ordinance gives preferences to these decorations over other noncommercial signs and thereby engages in content-based discrimination. (Pls.' Fourth at 9.) In plaintiffs' view, the fact that an object must be viewed to determine if it is a seasonal decoration subject to no size or numerosity requirements, as opposed to a traditional sign that is subject to these restrictions, indicates that the ordinance engages in content based discrimination. (*Id.* (citing *City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993)).) Defendants disagree that the seasonal display exemption should be construed as a content-based exception.

The decision in *Granite State Outdoor Adver., Inc. v. City of Clearwater, Florida,* 213 F.Supp.2d 1312 (M.D.Fla.2002), *aff'd in part and rev'd in part on other grounds,* 351 F.3d 1112 (11th Cir.2003), touched very briefly on whether a sign ordinance had engaged in content-based regulation when it exempted holiday decorations from requirements imposed on other types of signs. The district court determined that any incongruence arising from such an exemption was *de minimus. Id.* at 1334 n. 36. Here too, there is no indication that the City has provided exemptions for seasonal decorations because it hopes to suppress, disadvantage, or impose differential burdens on any kind of speech. There is likewise no indication that the City will allow St. Patrick's Day decorations, but disallow Cinco de Mayo displays. Indeed, in earlier motions, the plaintiffs had complained, and properly so, that defendants' ordinance was so broad as to cover seasonal decorations within its ambit; in these pleadings, plaintiffs had made clear their support for holiday decorations. (*See, e.g.,* Pls.' Br. in Supp. of Pls.' Mot. for Summ. J. [11] at 10.)

Instead, with its exemption, the City has simply recognized that seasonal decorations are a different animal than traditional signs and that such three-dimensional decorations resist being subject to the standardized height, number, and size limitations placed on two-dimensional signs. The Court likewise views seasonal decorations differently than traditional signs. In the first place, a "free speech" or political sign has a "content" that can be discerned by reading its words. Not so, holiday decorations. For decades, Americans have placed sparkling lights outside their homes, spread cobwebs in their shrubbery, displayed bats and witches in their yards and doorways, and hidden Easter eggs in their yards. While a black cat, a reindeer with a red nose, a leprechaun, or an Easter bunny may certainly evoke feelings—usually, positive, warm feelings in all but the most grumpy—it would be difficult to ascribe "content" to such decorations. Typically, such decorations communicate nothing more about the homeowner's opinion than that he or she has a sense of whimsy, a communal spirit, and a desire to reconnect with traditions that bind the generations. In exempting holiday decorations, the City appears to have recognized this reality. Moreover, in allowing holiday decorations, the City is not prohibiting or restricting any viewpoint or subject matter from being discussed. A content-neutral regulation applies equally to all. *Burk v. Augusta–Richmond Cty.,* 365 F.3d 1247, 1254 (11th Cir.2004). Thus, all seasonal and holiday displays of any kind—whether a sukkah or Santa's sleigh—are exempt from the size restrictions of the ordinance.

In short, the Court concludes that the exemption of seasonal displays and decorations from the other restrictions of the ordinance, save the set-back provision, *supra,* does not undermine the ordinance's status as a content-neutral regulation or

trigger more than intermediate scrutiny of the height, number, and size restrictions on signs. Typically, holiday decorations enhance the aesthetics of a community, not diminish it; allowing such displays does not suppress expression, but instead encourages it. Yet, to the extent that not everyone appreciates such decorations, "[t]he Constitution does not require the City to choose between curing all of its aesthetic problems or curing none at all." *Don's. Porta Signs, Inc. v. City of Clearwater,* 829 F.2d 1051, 1053 (11th Cir.1987). Therefore, as to the argument that the seasonal display exemption dooms the other restrictions of the sign ordinance, with the exception of the setback requirement, Plaintiffs' Fourth Motion for Summary Judgment [71] is **DENIED** and Defendants' Cross Motion for Summary Judgment [74] is **GRANTED.**

### 3. Flags

■ With respect to § 5–376 governing flags, plaintiffs argue that flags count against a homeowner's twelve square feet total sign allotment so that a homeowner who displays a 3x5 foot flag would not be entitled to display any additional signage. (Pls.' Fourth at 8.) Plaintiffs' argument is based on the flag provision's silence as to whether flag square footage counts against the twelve square feet total sign allotment. (Pls.' Reply Br. in Support of Pls.' Fourth Motion for Summ. J. and Resp. to Defs.' Cross Mot. for Summ. J. [75] ("Pls.' Reply") at 16.) Defendants argue that § 5–376(i) allows property owners to display flags as noncommercial signage, but does not require that flags be counted toward the twelve square feet sign limit. (Defs.' Resp. to Pls.' Statement of Material Facts Not in Dispute [73] at ¶ 14.)

Plaintiffs are correct in their assertion that § 5–376 does not specify whether a flag's square footage counts against a residential lot's twelve square feet allotment. However, § 5–376(a) does state that flag-

poles in residential lots may be as high as twenty-five feet. At the same time, § 5–376(b) indicates that, on pole heights up to twenty-five feet (the maximum for a residential lot), flags may be up to twenty-four square feet. Given this language of § 5–376, it is clear that flags were not intended to count against the twelve square feet allotment. If flags were intended to count against the twelve square feet allotment then, presumably, the ordinance would have stated that no flag displayed on residential property may be larger than twelve square feet. Having resolved the debate over whether flags do or do not count against the twelve square feet sign allotment, the Court must still address concerns associated with the enforcement of the flag provision.

■ Under § 5–376(e) of the ordinance, "[f]lags displaying a logo, message, statement or expression relating to commercial interests, and banners not meeting the definition of flag contained in Section 5–362 must conform to all applicable ordinances pertaining to signs." (Sign Ordinance at § 5–376(e), attach. as Ex. A to Notice of Amendment to Sign Ordinance [65].) These "applicable ordinances" state that, with the exception of real estate and yard sale signs, no sign containing a commercial message shall be allowed on any residential property in the city. (*Id.* at § 5–380(a).) Despite this ban on commercial flags in residential areas, plaintiffs have allowed flags displaying the Atlanta Braves logo and flags of other professional sports teams to fly undisturbed. (Defs.' Resp. at 19.)

In defense of their failure to enforce § 5–376(e), defendants argue that:

merely expressing support for a profit-making organization as matter of civic pride, a major motivation for expressions of support for professional sports teams, is not the same as displaying an

emblem for a company, such as a real estate firm, with the intent of enticing the public to use that company's services or to buy their products.

(*Id.*)

Defendants' argument is undermined by the ordinance's definition of a commercial message as, "any message that promotes a business or attempts to generate good will for a business; any message that advertises a product or service for sale; and any message that proposes a commercial transaction." (Sign Ordinance at § 5–362, attach. as Ex. A to Notice of Amendment to Sign Ordinance [65].)

Given the City's choice of definitions, it cannot extricate an Atlanta Braves flag, or the flag of any other professional sports team, from the ambit of a commercial message. Team spirit aside, professional sports teams are money-making enterprises.[19] Sports merchandise is designed to promote these money-making enterprises. Defendants' failure to enforce the ban on the posting of commercial messages in residential areas against the flags of professional sports teams constitutes content-based discrimination. By neglecting to enforce the ordinance against the flags of professional sports teams while at the same time enforcing the ordinance against other commercial flags, the City has imposed a differential burden upon speech because of its content. Non-sports team commercial messages are at a disadvantage, and thus such content-based restrictions are presumptively invalid. *R.A.V.,* 505 U.S. at 382, 112 S.Ct. 2538.

Normally, government restrictions on commercial speech are evaluated using the *Central Hudson* four-part test. However here, in its enforcement practices, the City is not differentiating between commercial and noncommercial speech, it is arbitrarily discriminating between two kinds of commercial speech solely because of its content. The City clearly has the right to ban all offsite commercial messages. *See Metromedia, Inc.,* 453 U.S. at 498, 101 S.Ct. 2882. But, now that it has done so, it cannot, by virtue of its enforcement practices, simply elect to give the flags of some commercial ventures special status. Consequently, the Court applies the strict scrutiny standard of review to the City's arbitrary enforcement practice.[20] To survive such a review the City must show that its regulation is, "necessary to serve a compelling state interest and is narrowly draw to achieve that end." *Simon & Schuster, Inc.,* 502 U.S. at 118, 112 S.Ct. 501. The City has failed to demonstrate how failing to enforce the ordinance against the flags of professional sports teams is necessary, or even related, to the City's goals of preserving safety and aesthetic harmony. At bottom, as an aesthetic matter, a flag is a flag. Therefore, Plaintiffs' Fourth Motion for Summary Judgment [71] is **GRANTED** as to the arbitrary enforcement of § 5–376(e) and Defendants' Cross Motion for Summary Judgment [74] is **DENIED** as to the same issue. In reaching this decision, the Court has had cause to evaluate and consider the ordinance's definition of "com-

---

**19.** Arguably, there is a strong commercial side to college sports as well.

**20.** Were the Court to apply the more permissive *Central Hudson* standard of review, the outcome would be the same. Under *Central Hudson* the ultimate question would become, "whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to

serve that interest." 447 U.S. at 566, 100 S.Ct. 2343. Allowing the flags of professional sports teams to be flown on residential lots while not allowing other commercial flags to be flown does not directly advance the City's goal of maintaining public safety and advancing aesthetic interests. Such differentiation between various types of commercial flags is more extensive than necessary, and impermissible under the Constitution.

mercial" and, in doing so, has found no constitutional error in the ordinance's definition of "commercial." Accordingly, Plaintiffs' Fourth Motion for Summary Judgment [73] is **DENIED** and Defendants' Cross Motion for Summary Judgment [74] is **GRANTED** as to the definition of "commercial."

Because the constitutional violation lies in the enforcement of this provision, and not its language, the City must be prepared to enforce the commercial flag ban in a non-arbitrary manner. Alternatively, if the City wishes to allow for the display of the flags of professional sports teams, then the ordinance must be amended to allow all types of commercial flags to be flown on residential lots.

### 4. Grandfathering Provision

Section 5–370 of the ordinance provides that, "[s]igns lawfully existing on the effective date of the ordinance, January 26, 1987, from which this article is derived which do not conform to the provisions of this article shall be deemed to be non-conforming signs and may remain." This grandfathering provision has caused great debate among the parties to this case. The grandfathering conflicts center around a historical marker, a sign marking the entrance to the "Condominium of Avondale Estates," and the decision of City enforcement officials not to enforce the sign ordinance against any sign in place before their jobs began. (Pls.' Fourth at 34–37.)

The historical marker at issue is this case was funded by a private group around 1997 and placed, by the City, on the right of way in front of the Gutzon Borglum house.[21] (PSMF at ¶ 46.) After the March 2004 amendments, § 5–372(e) of the ordinance provides an exception from the

ban on posting signs on the public right of way for "signs exempt under the Ordinance of the City of Avondale Estates and/or placed upon the right of way by governmental authority." (Sign Ordinance at Section 6, attach. as Ex. A to Notice of Amendment to Sign Ordinance [79].) The version of the ordinance in effect in 1997 exempted from the ordinance, "[s]igns of a noncommercial nature and in the public interest, erected by, or on the order of, a public officer in the performance of such officer's duty such as public notices, safety signs, traffic and street signs, memorial plaques, signs of historical interest and the like." (*See* Sign Ordinance at § 5–374(2), attach. as Ex. B to Defs.' Resp. to Pls.' Summ. J. Mot. [12].)

At the time it was erected, the Gutzon Borglum historical marker appears to have fallen under this exemption. Defendants therefore argue that the historical marker is exempt from the ordinance under the general grandfathering provision of § 5–370, and, second, that the historical marker is exempt under § 5–363(b) which exempts from the ordinance, "[s]igns erected on behalf of a governmental authority in the exercise of its proper jurisdiction." (Sign Ordinance, attach. as Ex. A to Notice of Amendment to Sign Ordinance [65].)

As plaintiffs argue, however, there is no way that a sign erected circa 1997 could fall under the broad grandfathering provision for signs existing on January 26, 1987. The City also correctly notes that the ordinance in effect when the marker was erected allowed historical markers. This argument makes good common sense, but the current ordinance does not carve out an exception for "signs" that were lawful when erected. The Court notes that were

---

**21.** Gutzon Borglum began the carving at Stone Mountain and later went on to carve Mount Rushmore. According to Ms. Martin-Hert's book, *Images of America: Avondale Es-* *tates, supra* at n. 1, Mr. Borglum lived in Avondale. The Court assumes that the marker is in front of his former home.

the ordinance to include such a provision, it could be a dangerous exception, given Avondale's past spotty and, at times, allegedly arbitrary enforcement.

■ Nevertheless, even without the grandfathering provision, the historical marker can constitutionally stand. The historical marker here was authorized and erected by the City, and therefore qualifies for the exemption now found in § 5–363(b) (signs are exempt from size/set back restrictions if placed upon the right of way by governmental authority). Plaintiffs suggest that, by allowing the historical marker in the right of way, while at the same time prohibiting other signs from the same right of way, the City has engaged in content-based discrimination and it denies plaintiffs equal protection of the laws. The Court disagrees. Like a street or road sign, a historical marker falls within the ambit of local government authority. Necessarily, there will be few historical markers; apparently, Avondale has only one. Just as a municipality has an interest in posting signs for the public's benefit, such as traffic signs, it has an interest in educating the citizenry about the history of its community. That it does so does not mean that it has abandoned its concern for, or undermined the aesthetics of, the area. There is a qualitative difference between a City marking a historical building with a single historical marker, and its allowing its citizenry to create a bazaar-like effect on the public right of way. Moreover, the City only has the power to erect its signs on rights of way; it cannot commandeer someone's front yard for that purpose.

Accordingly, the Court does not conclude that there is content-based discrimination, as a result of Avondale's erection of a historical marker on a right of way. Given plaintiffs' anecdotes about Avondale's past inconsistent administration of ordinances, however, the Court notes a possible concern that the current ordinance not give Avondale officials too much discretion in deciding when otherwise non-compliant signs can be erected. The Court believes that the language limiting such exempt signs to "[s]igns erected *on behalf of a governmental authority in the exercise of its proper jurisdiction,*" should provide enough restrictions to prevent, for example, Avondale from allowing its officials to post large yard sale signs for their own homes on the public right of way.[22] If there is substantial inconsistency in enforcement in this area, the plaintiffs can bring an "as applied" challenge in the future.

For the above reasons, Plaintiffs' Fourth Motion for Summary Judgment [71] challenging the constitutionality of the historical marker is **DENIED** and Defendants' Cross Motion for Summary Judgment [74] is **GRANTED** as to the same issue.

■ In addition to the historical marker, plaintiffs object to a sign marking the planned development known as the "Condominium of Avondale Estates" because it is a commercial sign that was approved at a time when the City banned anything other than house numbers, historic markers, original house designations, or street identification numbers from residential districts. (Pls.' Fourth at 34–35; Pls.' Reply at 11.) Unlike the City's standard street

---

**22.** The language in the 1997 ordinance was actually pretty specific and could be used again if any allegations of inconsistent enforcement arise. That language, again, exempted "[s]igns of a noncommercial nature and in the public interest, erected by, or on the order of, a public officer in the perform-ance of such officer's duty such as public notices, safety signs, traffic and street signs, memorial plaques, signs of historical interest and the like." (*See* Sign Ordinance at § 5–374(2), attach. as Ex. B to Defs.' Resp. to Pls.' Summ. J. Mot. [12].)

signs with lettering three inches or less in height, (Defs.' Resp. at 8), the sign marking the condominium development measures 10 X 4.5 feet. (PSMF at ¶ 47.) Defendants argue that the sign was approved along with the plans for the development and is "grandfathered" pursuant to § 5–370. (Defs.' Resp. at 10.) The difficulty here is that the grandfathering provision only applies to non-conforming signs in existence prior to January 26, 1987. In this case, neither party has provided the Court with evidence of when exactly the condominium sign was approved or constructed. Instead, the parties have both made vague general references indicating that the condominium sign was approved during the "total ban" on residential signs and before the 2002 version of the ordinance. (Pls.' Am. Mot. for Summ. J. and Statement of Material Facts Not in Dispute [51] at ¶ 17.) Without this evidence the Court cannot definitively decide whether or not the grandfathering provision applies, so the grandfathering provision cannot resolve the condominium sign issue for purposes of this motion.

Defendants also argue that the condominium marker is a "subdivision sign" typically provided for in jurisdictions where new residential developments are the norm. That may be true, but as plaintiffs correctly point out, as far back as 1989, the City has banned all subdivision signs. (Pls.' Reply at 12.) Defendants counter with the argument that the sign was approved with the plans for the development at a time prior to the enactment of the current sign ordinance. (Defs.' Resp. at 10.) City approval may, in fact, have brought the sign in compliance with the ordinance in effect at the time, but that does not mean that the sign was or is constitutional. Plaintiffs argue that the City's approval of the condominium sign during a time that the City was otherwise banning such residential signs constitutes content-based discrimination. The Court agrees.

The City gave the condominium development approval for its sign at a time when other residents were banned from displaying any sign or message. There is no evidence in the record explaining or justifying the City's decision to approve the disproportionately large, in comparison to other street signs erected by the City, condominium sign. The favoritism shown the condominium development sign at the time it was approved had the effect of imposing differential burdens upon speech based on its content. Such content-based restrictions on speech are presumptively invalid. *See R.A.V.,* 505 U.S. at 382, 112 S.Ct. 2538. Consequently, to defend its content-based speech restriction, the City must show that is restriction is, "necessary to serve a compelling state interest and is narrowly drawn to achieve that end." *Simon & Schuster, Inc.,* 502 U.S. at 118, 112 S.Ct. 501. The City has failed to show the Court the necessity of approving the condominium development sign during the near total ban on residential signs. Therefore, Plaintiffs' Fourth Motion for Summary Judgment [71] challenging the constitutionality of the condominium sign is **GRANTED** and Defendants' Cross Motion for Summary Judgment [74] is **DENIED** as to the same issue. The Court having found the "Condominium of Avondale Estates" sign not to be permissible under the ordinance, the City must either direct the removal of this sign, or else cause this Court to reexamine the constitutionality of other parts of its ordinance.

This brings the Court to the last of the three grandfathering issues. Namely, the decision of City sign ordinance enforcement officials to not enforce the sign ordinance against any sign in place before their jobs began. (Pls.' Fourth at 37.) In deposition testimony,

City Code Enforcement Officer Craig Mims and City Manager/Chief of Police John Parker indicated their intention not to enforce the sign ordinance against any sign in place prior to their tenure. (PSMF at 52.) This practice translates into a "free pass" for those non-compliant signs that were erected prior to the current enforcement officials' tenure. While this policy may be an easy way for enforcement officials to determine which non-compliant signs that they will actively seek to bring into compliance with the sign ordinance, it is not constitutional. Having decided to enact a rigorous sign ordinance, the City cannot selectively apply its provisions for the sake of convenience. Moreover, if aesthetics are a concern, that concern is not promoted by allowing non-compliant signs, no matter when they may have been erected. Therefore, Plaintiffs' Fourth Motion for Summary Judgment [71] challenging the constitutionality of the decision not to enforce the sign ordinance against non-compliant signs in place prior to the start date of City Code Enforcement Officer Mims and City Manager/Chief of Police Parker is **GRANTED** and Defendants' Cross Motion for Summary Judgment [74] is **DENIED** as to the same issue. Henceforth, the City is ordered to apply the provisions of its sign ordinance equally without regard to the start date of any sign ordinance enforcement officer or other City official. Having so decided federal First Amendment claims, the Court will now discuss state constitutional considerations.

## V. Analysis Under the Georgia Constitution

The Georgia constitution provides that "[n]o law shall be passed to curtail or restrain the freedom of speech or of the press." Ga. Const. art. I, § 1, ¶ V. The Georgia Supreme Court has indicated that the Georgia Constitution, "provides even broader protection of speech than the first amendment." *Statesboro Publ'g Co. v. City of Sylvania,* 271 Ga. 92, 95, 516 S.E.2d 296, 299 (1999). This Court is not sure why this would be so as the language of the Georgia constitutional provision—no law shall be passed to curtail or restrain the freedom of speech—does not appear substantively different or more onerous than the language of the First Amendment, which prohibits laws that abridge freedom of speech. At any rate, distinguishing itself from federal constitutional requirements for content-neutral speech, the *Statesboro* court indicated that the Georgia Constitution requires the government to adopt the least restrictive means possible even for content-neutral speech regulations. *Id.* Nevertheless, the Georgia Supreme Court's general characterization of its jurisprudence notwithstanding, when analyzing sign ordinances, "Georgia courts have consistently applied United States Supreme Court precedent, drawing no analytical distinction between the state and federal constitutions." *Lamar Adver. Co.,* 254 F.Supp.2d at 1334 (citing *State v. Cafe Erotica, Inc.,* 270 Ga. 97, 507 S.E.2d 732 (1998); *Union City Board. of Zoning Appeals v. Justice Outdoor Displays, Inc.,* 266 Ga. 393, 467 S.E.2d 875 (1996); *H & H Operations, Inc. v. City of Peachtree City,* 248 Ga. 500, 283 S.E.2d 867 (1981)). Moreover, were Georgia's standards truly more rigid than federal standards, one would have expected plaintiffs to have brought their action in a Georgia court, not a federal court.

In summary, the Court concludes that analysis of the sign ordinance is the same under both the Georgia constitution and under the federal constitution. *See Lamar Adver. Co.,* 254 F.Supp.2d at 1334.

## VI. Voting Rights Act

In addition to their other claims, plaintiffs have alleged violations of Section

5 of the Voting Rights Act. (Pls.' Fourth at 38.) The Voting Rights Act of 1965 provides:

> [n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color...

42 U.S.C. § 1973(a).

To facilitate compliance with this provision, the Voting Rights Act requires covered jurisdictions to get clearance from the Attorney General of the United States or the United States District Court for the District of Columbia before enacting, "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964." [23] 42 U.S.C. § 1973c. Under Section 5, and in accordance with 28 U.S.C. § 2284, any action for violations of this provision must be heard and determined by a three-judge district court. *See id.* Though single district judges may not determine the merits of claims alleging a failure to comply with the provision of Section 5, if a plaintiff's challenge is "wholly insubstantial" or "completely without merit" the district judge may determine that a three-judge panel is not required. *United States v. Saint Landry Parish Sch. Board.*, 601 F.2d 859, 863 (5th Cir.1979); [24] *LaRouche v. Fowler*, 152 F.3d 974, 981–82 (D.C.Cir. 1998) (internal citations omitted).

Plaintiffs argue that the Avondale sign ordinance is a *voting practice or procedure* that should have been cleared prior to its implementation. (Pls.' Fourth at 39; Pl.'s Br. in Supp. of Pls.' Second Mot. for Summ. J. [42] at 23–25.) According to plaintiffs, the City sign ordinance in effect on November 1, 1964, did not limit or regulate residential signs unless they extended over highways, streets, or alleys. (*Id.* at 23 n. 13.) The City first adopted a sign ordinance that banned all signs in residential areas in 1967. (*Id.* at 23.) Plaintiffs argue that this post–1964 change, and all subsequent changes in the ordinance have affected the usage of political signs and thus are changes in voting practices or procedures that are subject to the preclearance requirement of Section 5. (*Id.* at 24.)

The Court begins its examination of the Section 5 preclearance requirement "where courts should always begin the process of legislative interpretation, and where they often should end it as well, which is with the words of the statutory provision." *United States v. McNab*, 331 F.3d 1228, 1236 (11th Cir.2003) (internal citations omitted). "[W]hen the words of a statute are unambiguous ... [the] judicial inquiry is complete." *Id.* Only where the legislative language is ambiguous or would lead to absurd results may a court consult legislative history to attempt to discern the "true intent" of Congress. *Id.*

Here, the plain language of the statute offers no indication that a municipal sign ordinance, even one regulating political signs, would be subject to the preclearance requirement. The sign ordinance does not fit into any of the types of regulations that are enumerated as being subject to the preclearance requirement. It deals with neither voting qualifications nor prerequi-

---

**23.** Georgia is a "covered jurisdiction" subject to the pre-clearance requirements of 42 U.S.C. § 1973c. *See Georgia v. Ashcroft*, 539 U.S. 461, 123 S.Ct. 2498, 156 L.Ed.2d 428 (2003).

**24.** Decisions of the Fifth Circuit handed down before the close of business on September 30, 1981, are binding in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

sites to voting, and it sets no "standard, practice, or procedure with respect to voting." *See* 42 U.S.C. § 1973c. Quite simply, the plain language of the statute offers nothing to support plaintiffs' argument that the sign ordinance was or is subject to the pre-clearance requirement of the Voting Rights Act.

Even if the plain language of the statute indicated some ambiguity, the Court's interpretation is supported by congressional intent in enacting the Voting Rights Act. The Act was aimed at both obvious and subtle regulations which would have the effect of denying citizens their right to vote because of their race. *Allen v. State Bd. of Elections*, 393 U.S. 544, 565, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969). In doing so, the Act gives a broad interpretation to the right to vote, including "all action necessary to make a vote effective." *Id.* at 565–66, 89 S.Ct. 817 (citing 42 U.S.C. § 1973*l* (c)(1)).[25] Plaintiffs have never alleged, however, that the sign ordinance in question here has the effect of denying citizens their right to vote because of their race.[26] Giving even the broadest interpretation to the right to vote, it is not apparent how posting a sign of certain dimensions or a certain number of signs would be "necessary" to make a vote effective. Political signs and advertisements certainly contribute to a healthy political discourse, but their presence or absence does not directly affect a person's ability to vote.

The goal of Section 5 is to insure that no changes in voting procedure are made "that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Miller v. Johnson*, 515 U.S. 900, 926, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995) (quoting *Beer v. United States*, 425 U.S. 130, 141, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976)). Guided by the Supreme Court's instruction that Section 5 is to have the "broadest possible scope," *Allen*, 393 U.S. at 566, 89 S.Ct. 817, the Court is still unable to find how Section 5 applies to the sign ordinance at issue in this case, let alone a violation of the section.

In sum, both the plain language of Section 5 and the congressional intent behind it convince this Court that the preclearance requirement does not apply to the City's sign ordinance. Plaintiffs have been unable to point to any authority that would contradict this conclusion. Because the Court finds that plaintiffs' claims are wholly insubstantial and obviously without merit, a three-judge court is not required in this case. Plaintiffs' Fourth Motion for Summary Judgment [71] is **DENIED** as to the Voting Rights claims, and Defendants' Cross Motion for Summary Judgment [74] is **GRANTED** as to the same issue.

## VII. Equal Protection Claims

Plaintiffs also challenge the sign ordinance under the Equal Protection Clause of the United States Constitution. (Pls.'

**25.** Indeed, the Act's definition of "vote" or "voting" gives no indication that a regulation directed even squarely at political signs could be considered a standard, practice, or procedure with respect to voting.

The terms "vote" or "voting" shall include all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to, registration, listing pursuant to this subchapter, or other action required by law prerequisite to voting, casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast with respect to candidates for public or party office and propositions for which votes are received in an election.

42 U.S.C. § 1973*l* (c)(1).

**26.** Nor have plaintiffs given any indication as to how the sign ordinance could negatively impact racial minorities in their voting. The ordinance applies to all residents of the City, not just to minorities.

Fourth at 9.) The Equal Protection Clause requires that the government treat similarly situated persons in a similar manner.[27] U.S. Const. amend. XIV, § 1. When people are classified in such a way that they receive different treatment under the law, the degree of scrutiny the court applies depends upon the basis of the classification. *Gary v. City of Warner Robins, Georgia,* 311 F.3d 1334, 1337 (11th Cir.2002) (internal citations omitted). If a fundamental right or a suspect class is involved, the court reviews the classification using strict scrutiny. *Lamar Adver. Co.,* 254 F.Supp.2d at 1339 (internal citations omitted). In contrast, "[i]f an ordinance does not infringe upon a fundamental right or target a protected class, equal protection claims relating to it are judged under the rational basis test; specifically, the ordinance must be rationally related to the achievement of a legitimate government purpose." *Id.*

The Avondale sign ordinance does not classify persons based upon any suspect classification. Therefore, unless the ordinance infringes upon a fundamental right, it will be scrutinized using the rational basis test. Here, plaintiffs are asserting their right to erect certain types of signs on their property and the property of others without the restrictions that have been put in place by the ordinance. As prior sign ordinance case law demonstrates, there is no fundamental right to display any and all signs without restriction. *See Metromedia,* 453 U.S. 490, 101 S.Ct. 2882; *Members of City Council of Los Angeles,* 466 U.S. 789, 104 S.Ct. 2118; *Harnish v. Manatee County, Florida,* 783 F.2d 1535, 1539–40 (11th Cir.1986).

Consequently, the City sign ordinance is subject to only a rational basis level of review. *See Lamar Adver. Co.,* 254 F.Supp.2d at 1339.

The Court has already found that much of the sign ordinance is permissible under the more stringent requirements of the First Amendment, and, as to these provisions, there is no need to conduct an independent equal protection analysis. *Lamar Adver. Co.,* 254 F.Supp.2d at 1339 (citing *Outdoor Sys., Inc. v. City of Atlanta,* 885 F.Supp. 1572, 1582 (N.D.Ga.1995) (O'Kelley, J.)). As to those provisions found unconstitutional under the First Amendment, holding them to be also violative of the Equal Protection Clause does not seem to accomplish much.[28] Therefore, Plaintiffs' Fourth Motion for Summary Judgment [71] is **DENIED without prejudice** on the equal protection challenge and Defendants' Cross Motion for Summary Judgment [74] is also **DENIED** as to the same issue. The Court simply **DISMISSES without prejudice** the Equal Protection claims as being subsumed in the First Amendment claims.

## VIII. Severability of Unconstitutional Provisions

Because the Court has held some of the provisions of the City's sign ordinance unconstitutional, the Court must verify that the unconstitutional provisions can be severed from those found to be constitutional. In arguing that the Court can sever those provisions found to be unconstitutional from the remainder of the ordinance and still leave the constitutional provisions of the ordinance intact, defendants rely on the severability clause found in § 5–382(a). (Defs.' Resp. at 23.) This provision provides:

> the sections, paragraphs, sentences, clauses and phrases of the Sign Ordi-

---

**27.** The Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

**28.** Arguably, those ordinance sections that failed the First Amendment test might meet the likely more lenient rational basis test.

nance are severable, and if any phrase, clause, sentence, paragraph or section of this ordinance shall be declared unconstitutional or invalid by any judgment or decree of any court of competent jurisdiction, the unconstitutional or invalid phrase, clause, sentence, [or] paragraph shall be struck and the remaining phrases, clauses, sentences, paragraphs, and sections shall be effective as if the unconstitutional or invalid portion had not existed.

(Sign Ordinance at § 5–382(a), attach. as Ex. A to Notice of Amendment to Sign Ordinance [65].)

In contrast, plaintiffs argue that the ordinance is so rife with constitutional deficiencies that "it is not capable of being modified to comport with the Constitution." (Pls.' Br. in Supp. of Am. Mot. for Summ. J. [51] at 24.)

When a portion of any ordinance is judicially invalidated, the Court must apply Georgia law to determine what portion of the ordinance, if any, survives under a severability clause. *Artistic Entm't, Inc.*, 331 F.3d at 1204. Under Georgia law, the existence of a severability clause creates a presumption in favor of severance. *Id.* However, the Court must not, "give to the statute an effect altogether different from that sought by it when considered as a whole." *City Council of Augusta v. Mangelly*, 243 Ga. 358, 363, 254 S.E.2d 315, 320 (1979). "[I]n order for one part of a statute to be upheld as severable when another is stricken as unconstitutional, they must not be mutually dependent on one another." *Id.* at 363–64, 254 S.E.2d at 320 (internal citations omitted). Accordingly, the Court must determine whether the invalid provisions of the City sign ordinance are mutually dependent upon any other portions of the sign ordinance, while at the same time preserving the original

purpose of the ordinance. *See Artistic Entm't, Inc.*, 331 F.3d at 1204.

In *Union City Board. of Zoning Appeals v. Justice Outdoor Displays, Inc.*, 266 Ga. 393, 396–99, 467 S.E.2d 875, 879–81 (1996), the Georgia Supreme Court invalidated significant portions of a sign ordinance as unconstitutional under both the First Amendment and the free speech guarantee of the Georgia constitution. Nevertheless, the court held that severance was appropriate. *Id.* at 404, 467 S.E.2d at 884–85. The court found that the stated purpose of the act, to provide for the public safety and welfare, was still served after these provisions were removed. *Id.*

In the instant case, none of the provisions declared unconstitutional by the Court are so mutually dependent upon any of the remaining provisions of the ordinance that they cannot be severed from the sign ordinance as a whole without impeding the purpose of the ordinance, namely, the promotion of aesthetic harmony and public safety. Even after the objectionable parts of the ordinance have been stricken, more than enough of it remains to accomplish the purposes of the City in passing the ordinance in the first place. Accordingly, the Court holds that severance is appropriate.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** in part and **DENIES** in part Plaintiffs' Fourth Motion for Summary Judgment [71]; **GRANTS** in part and **DENIES** in part Defendants' Cross Motion for Summary Judgment [74]; and **GRANTS** Plaintiffs' Motion for Leave to File Supplemental Material Regarding Occurrence Subsequent to Summary Judgment Filings [81].[29]

In sum, today the Court orders that:

29. In today's Order the Court has attempted

to address all of the issues raised in plaintiffs'

1. All claims against defendants John Parker, Lyda Steadman, and Craig A. Mims be **DISMISSED**, and that summary judgment be **GRANTED** as to these defendants.

2. Plaintiffs have standing, and that Defendants' Cross Motion for Summary Judgment [74] be **DENIED** as to this issue.

3. The size and height restrictions on real estate signs, as well as the definition of "real estate sign", are constitutional, and that Plaintiff's Fourth Motion for Summary Judgment [73] be **DENIED** and Defendants' Cross Motion for Summary Judgment [74] be **GRANTED** as to these issues.

4. The number and location restrictions on yard sale signs is constitutional, and that Plaintiff's Fourth Motion for Summary Judgment [73] be **DENIED** and Defendants' Cross Motion for Summary Judgment [74] be **GRANTED** as to this issue.

5. The size and height restrictions on signs, as well as the definition of "sign", are constitutional, and that Plaintiff's Fourth Motion for Summary Judgment [73] be **DENIED** and Defendants' Cross Motion for Summary Judgment [74] be **GRANTED** as to these issues.

6. The ban on posting signs on the public rights of way is constitutional, and that Plaintiff's Fourth Motion for Summary Judgment [73] be **DENIED** and Defendants' Cross Motion for Summary Judgment [74] be **GRANTED** as to this issue.

7. The general setback provision is constitutional, and that Plaintiff's Fourth Motion for Summary Judgment [73] be **DENIED** and Defendants' Cross Motion for Summary Judgment [74] be **GRANTED** as to this issue.

8. The exemption for seasonal displays and decorations from the general setback provision is, however, unconstitutional, and that Plaintiff's Fourth Motion for Summary Judgment [73] be **GRANTED** and Defendants' Cross Motion for Summary Judgment [74] be **DENIED** as to this issue.

9. The general exemption for seasonal displays from the ordinance's height, number, and size restrictions is constitutional, and that Plaintiff's

four separate motions for summary judgment and defendants' two cross motions for summary judgment. The fact that defendants have amended their ordinance five times since the commencement of this case has not made this task any easier. Indeed, as a consequence of the moving-target nature of this litigation, the Court may have inadvertently failed to address one or more claim. For example, the Court is unclear as to whether plaintiffs even continue to challenge the ordinance overall as arbitrarily enforced in violation of the Equal Protection Clause of the Fourteenth Amendment and the First Amendment. (*See* Pls.' Am. Mot. for Summ. J. and Statement of Material Facts Not in Dispute [51] at 7 n. 1; Pls.' Fourth Mot. for Summ. J. and Statement of Material Facts Not in Dispute [71] at 6.) See discussion *supra*.

On a related note, in part because plaintiffs have failed to cite to any case law in support, the Court is not clear as to whether, and on what grounds, plaintiffs intended to challenge the ordinance based on the possibility that a violation of defendants' ordinance could be punished by six months imprisonment. (*See id.*)

In sum, if either party believes there is an issue raised that has not been addressed by the Court in today's Order, that party may file a motion for reconsideration on that issue with the Court. Pursuant to Local Rule 7.2E, such motion must be filed with the Clerk of Court within ten (10) days after the entry of this Order.

Fourth Motion for Summary Judgment [73] be **DENIED** and Defendants' Cross Motion for Summary Judgment [74] be **GRANTED** as to this issue.

10. The inconsistent enforcement of the ordinance provision concerned with flags which display a logo, message, statement, or expression relating to commercial interests, § 5–376(e), is unconstitutional, and that Plaintiff's Fourth Motion for Summary Judgment [73] be **GRANTED** and Defendants' Cross Motion for Summary Judgment [74] be **DENIED** as to this issue.

11. The definition of "commercial" is constitutional, and that Plaintiff's Fourth Motion for Summary Judgment [73] be **DENIED** and Defendants' Cross Motion for Summary Judgment [74] be **GRANTED** as to this issue.

12. The Gutzon Borglum historical marker is constitutional, and that Plaintiff's Fourth Motion for Summary Judgment [73] be **DENIED** and Defendants' Cross Motion for Summary Judgment [74] be **GRANTED** as to this issue.

13. The sign marking the planned development known as the "Condominium of Avondale Estates" is unconstitutional, and that Plaintiff's Fourth Motion for Summary Judgment [73] be **GRANTED** and Defendants' Cross Motion for Summary Judgment [74] be **DENIED** as to this issue.

14. The decision not to enforce the sign ordinance against non-compliant signs in place prior to the start date of City Code Enforcement Officer Mims and City Manager/Chief of Police Parker is unconstitutional, and that Plaintiff's Fourth Motion for Summary Judgment [73] be **GRANTED** and Defendants' Cross Motion for Summary Judgment [74] be **DENIED** as to this issue.

15. A three-judge panel is not required on the Voting Rights Act claim, and that Plaintiff's Fourth Motion for Summary Judgment [73] be **DENIED** and Defendants' Cross Motion for Summary Judgment [74] be **GRANTED** as to this issue.